CHARLES O. FINLEY AND COMPANY, INC., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Charles O. Finley & Co. v. Commissioner
Docket Nos. 8342-71, 8343-71, 7219-73, 7220-73.
United States Tax Court
T.C. Memo 1982-354; 1982 Tax Ct. Memo LEXIS 396; 44 T.C.M. (CCH) 225; T.C.M. (RIA) 82354; June 22, 1982. *396 Held: (1) Payments of $1,000,000 and $25,000 made by the corporate petitioner to petitioner-husband were dividends and not repayments of loans. These amounts are includible in petitioner-husband's gross income. Sec. 301(c)(1), I.R.C. 1954. (2) The corporate petitioner's working capital did not exceed the reasonable needs of its business. The corporate petitioner is not liable for the accumulated earnings tax imposed by section 531, I.R.C. 1954. James L. Fox and Richard S. Hartford, for the petitioners. James F. Kidd, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal income tax, including accumulated earnings tax, and additions to tax under section 6653(a) [2] (negligence) against petitioners as follows: Taxable
Amount
Accumulated
Addition to
Docket
Year
of
Earnings Tax
Tax
No.
Petitioners
Ended
Deficiency
Portion [3]
Sec. 6653(a)
8342-71
Charles O. Finley and
3/31/60
$ 5,257,09
Company, Inc.
3/31/61
26,172.31
$1,308.61
[4] 10/31/61
225,257.83
10/31/62
56,354.21
10/31/63
690,747.98
$348,014.09
10/31/64
148,501.48
124,197.89
10/31/66
79,869.11
259,217.25
8343-71
Charles O. Finley and
12/31/61
69,130.41
3,456.52
Shirley M. Finley
12/31/62
24,903.01
1,245.15
12/31/63
12,999.82
12/31/64
13,674.55
12/31/65
712,044.05
12/31/66
22,576.36
7219-73
Charles O. Finley and
10/31/67
163,207.99
229,102.85
Company, Inc.
10/31/68
382,849.59
304,271.08
7220-73
Charles O. Finley and
10/31/65
1,317.26
160,676.22
2,796.75
Company, Inc.
*397 After settlement of some issues and severance of other issues, [5] the issues for decision are: (1) Whether payments of $1,000,000 and $25,000 made by Charles O. Finley and Company, Inc. (herein-after sometimes referred to as "Company"), to Charles O. Finley were dividends or repayments of loans; and (2) Whether Company's earnings and profits were accumulated beyond the reasonable needs of its business. [6] *398 FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and stipulated exhibits are incorporated herein by this reference. When the petitions in these cases were filed, petitioners Charles O. Finley (hereinafter sometimes referred to as "Charles") and Shirley M. Finley (hereinafter sometimes referred to as "Shirley"). husband and wife, resided in LaPorte, Indiana; the other petitioner, Company, was an Illinois corporation with its principal office in Chicago, Illinois. Company was incorporated on March 31, 1954, as a successor to Charles O. Finley and Company, a sole proprietorship. [7] At all relevant times, Company's outstanding stock was entirely owned by Charles, Shirley, and four of the children, as set forth in table 1. Table 1 Name
Number of Shares
Charles
310
Shirley
290
Sharon K. Finley
100
Charles O. Finley, Jr.
100
Catherine A. Finley
100
Paul H. Finley
100
Total
1,000
During the years in issue, Charles was Company's president and chairman of its board of directors and Shirley was Company's *399 secretary and a director. Company did not hold formal directors' or shareholders' meetings except on one occasion for the press. Charles ran Company himself in his own way and was in sole control of Company for all the times material to these cases. Initially, Company was in the insurance business. In 1961, Company acquired a major league sports franchise. On December 14, 1962, Company acquired certain assets of a plant food business. For much of the time in issue, Company operated in three divisions, hereinafter sometimes referred to as "the Insurance Division", "the Athletics Division", and "the New Plant Life Division". As of October 1978 (a decade after the last of the years in issue), Company had not declared a dividend to its shareholders; nor had it so treated any distribution or payment to or for the benefit of the stockholders (except by way of settlement with respondent in the instant cases). I. Dividend or Loan Repayment
In January and February 1961, Company acquired all of the capital stock of Kansas City Athletics, Inc. (hereinafter referred to as "Athletics, Inc."), for $3,961,900. Athletics, Inc. was a Missouri corporation which owned and operated the Kansas *400 City Athletics (hereinafter referred to as "the Athletics"), a major league baseball team in the American League of Professional Baseball Clubs (hereinafter sometimes referred to as "the American League). Company borrowed $1,500,000 from Harris Trust and Savings Bank (hereinafter referred to as "Harris Bank"), as evidenced by its note dated January 6, 1961, maturing ninety days there-after. (This loan is hereinafter sometimes referred to as "the Harris Bank loan".) On that date, Charles and Shirley pledged 7,520.5 shares of capital stock of Franklin Life Insurance Company (hereinafter referred to as "Franklin") owned by them as partial collateral for the Harris Bank loan. On January 31, 1961, Charles and Shirley sold all of the pledged shares of Franklin stock for $661,503.18, which amount was reported on schedules attached to their 1961 Federal income tax return. On that date, Charles directed Harris Bank to apply the proceeds from this sale to payment of the balance due on the Harris Bank loan. On February 3, 1961, the proceeds were applied by Harris Bank (along with proceeds from the sale of Franklin stock owned in whole or part by other parties) in payment of the remaining *401 balance due on the note and the note was then cancelled. Charles told Shirley about the sale of the Franklin stock and that he lent the proceeds therefrom to Company. No documents were executed designating this, transaction as a loan from Charles to Company. On February 10, 1961, in connection with the acquisition of the Athletics, Inc., stock, Company borrowed $2,500,000, evidenced by its note of the same date payable to the City National Bank and Trust Company of Kansas City (hereinafter referred to as "Kansas City Bank"), maturing six months thereafter. [8] (This loan is hereinafter sometimes referred to as "the Kansas City Bank loan".) As collateral for this loan, Charles, as Company's president, provided all of the stock of four corporations [9] *402 and assigned Company's insurance commissions. [10] On April 13, 1961, Company paid $500,000 to Kansas City Bank, reducing the loan balance to $2,000,000. Finley and Finley, Inc. (hereinafter referred to as "F & F") was an Illinois corporation. F & F was merged into Company effective after the close of business on March 31, 1961. F & F filed a final Federal income tax return, as amended, for its taxable year ended March 31, 1961, reflecting year-end earned surplus (retained earnings and profits) of $458,737.29 and total stated capital of its common stock of $5,000. Substantially all of this excess of assets over liabilities consists of a $450,000 account or note receivable from Company; Company included this amount in the total shown as short-term notes payable on its Federal income tax return for its taxable year ended March 31, 1961. Pursuant to a plan of liquidation adopted March 24, 1961, Athletics, Inc., was liquidated and dissolved on March 31, 1961, and all of its assets were merged and transferred *403 into Company. Thereafter Company owned and operated the Athletics as its internal division (the Athletics Division). Table 2 shows Company's total assets, liabilities, capital, and debt-equity ratio, based on its income tax returns for the taxable years ended March 31, 1960, and March 31, 1961. Table 2 Taxable Year
Ended
Total
Total
March 31,
Assets
Liabilities
Company, including Athletics, Inc., but not F & F
1960
$1,013,152.51
$124,817.33
1961
5,221,618.71
[2] 4,257,137.72
Company, including Athletics, Inc., and F & F
1961
[3] 5,334,718.32
[2][3] 3,906,499.94
Taxable Year
Ended
Total
Debt-Equity
March 31,
Capital [1]
Ratio
Company, including Athletics, Inc., but not F & F
1960
$888,335.18
.14:1
1961
964,480.99
4.41:1
Company, including Athletics, Inc., and F & F
1961
1,428,218.28
[3] 2.74:1
On August 10, 1961, Company executed a six-month note to Kansas City Bank in the amount of $2,000,000 representing the remaining balance of the Kansas City Bank loan. [11] Charles issued his personal check dated September 21, 1961, in the amount of $1,000,000 *404 payable to Kansas City Bank as payment on the Kansas City Bank loan. This check was received and applied by Kansas City Bank as a payment on that loan; it was applied as a payment on October 2, 1961, leaving a balance due on the note of $1,000,000. When he wrote the check, Charles wrote "Payment on Ball club loan" on the left margin of the face of the check and "Loan to Charles O. Finley + Co." at the bottom of the face of the check. Apart from the effect of the notations on the check, no documents were executed designating this transaction as a loan from Charles to Company. Charles told Shirley that he lent $1,000,000 to Company. As to Charles' asserted loans to Company of $661,503.18 (Harris Bank) and $1,000,000 (Kansas City Bank): (1) there were no contracts, notes, loan agreements, or any other documents executed (apart from Charles' notations on his $1,000,000 check to Kansas City Bank); (2) there were no fixed maturity dates or schedules *405 of repayments; and (3) no interest was ever paid, accrued, agreed upon, or discussed.Charles hoped to get the money back at the earliest convenience of Company. Company used a double-entry bookkeeping system on the accrual basis for the Athletics Division and the New Plant Life Division, but a single-entry bookkeeping system on the cash basis for the Insurance Division. Chris Retson (hereinafter referred to as "Retson"), an independent certified public accountant, prepared all income tax returns for Charles and Shirley and for Company for the years in issue. When Retson obtained the information to prepare Company's income tax returns for its taxable years ended March 31, 1961, and October 31, 1961, Charles advised Retson of the payments which he had made on behalf of Company on the Harris Bank loan and the Kansas City Bank loan, and that these payments were intended to be loans from Charles to Company. For the taxable year ended March 31, 1961, the $661,503.18 Franklin stock sale proceeds were included by Retson in the figure of $4,221,875 for short-term notes payable shown on the year-end balance sheet of Company's income tax return. For the taxable years ended October 31, 1961, *406 through 1967, the $661,503.18 Franklin stock sale proceeds and the $1,000,000 check to the Kansas City Bank were parts of a total of $1,800,000 [12] shown as loans from stockholders on the balance sheet of Company's income tax returns or schedules attached thereto. On February 9, 1962, Company borrowed $1,183,125 from Harris Bank. Of the proceeds of this loan, $1,000,000 was paid to Kansas City Bank in full payment of the remaining balance due on the Kansas City Bank loan.The $1,183,125 loan from Harris Bank was repaid by Company during 1963. On December 16, 1965, Company's Insurance Division issued a check written by and payable to Charles in the amount of $1,000,000. Charles deposited this check in his *407 personal checking account at the Gary National Bank (hereinafter referred to as "Gary Bank"). When he wrote the check, Charles made the notation "Payment on Loan to C.O.F." on the left margin of the face of the check. On May 18, 1966, Company's New Plant Life Division issued and delivered a check payable to Gary Bank in the amount of $25,000. The check was deposited and credited to Charles' personal account at this bank. The words "Payment on Baseball Loan" were written on the bottom of the face of the check and the words "Payment on Baseball Loan to Charles O. Finley" were written on the stub of the Company's checkbook for its New Plant Life Division. For the taxable years ended October 31, 1965, and October 31, 1966, Company had earnings and profits in excess of the respective amounts it paid Charles (see table 8, infra). As of late 1978, no other amounts had been paid to Charles towards the amounts he paid on behalf of Company. Charles' 1961 payments on behalf of Company to Harris Bank ($661,503.18) and Kansas City Bank ($1,000,000) are not loans to Company, they are contributions to Company's capital. II. Accumulated Earnings
a. Company's Business Needs
(1) Insurance *408 Division
Since its incorporation, Company has acted as broker and administrator of group insurance plans for various associations with particular emphasis on the medical profession. [13] Company's largest group program was the group disability program for the American Medical Association (hereinafter sometimes referred to as "the AMA program" and "AMA", respectively). Company's services as broker and administrator for the AMA program began on September 1, 1962, pursuant to a five-year contract. The AMA program was underwritten by the Continental Casualty Company. During the initial contract period, Company received insurance commissions periodically on the AMA program. These commissions to Company (as reported on its income tax returns) totalled $851,128.16, $640,861, $724,316.11, and $676,949.03 for its taxable years ended October 31 of 1963, 1964, 1965, and 1966, respectively. A comparable amount was received and reported as income by Company for its taxable year ended October 31, 1967. Company received and reported as income total insurance commissions *409 for each of its taxable years ended October 31, 1963, through 1967, of approximately $1,800,000 to $2,500,000. The insurance commissions received on the AMA program represented close to one-third of Company's total insurance commissions for its taxable years ended October 31, 1963, through 1967. In May 1966, AMA advised Company that AMA was soliciting bids to underwrite and administer the above-described program upon the expiration of its then-current policy on August 31, 1967. In a letter to AMA dated November 23, 1966, the executive vice-president of Fireman's Fund American Life Insurance Company (hereinafter referred to as "Fireman's Fund") proposed an offer to continue the existing initial AMA program requiring the Company be administrator-broker. Effective September 1, 1967, Company's contract to administer the AMA program was extended for an additional five years, with Fireman's Fund underwriting the program. Under Company's September 1, 1967, agreement with Fireman's Fund, the commissions earned by Company on the five-year renewal of the AMA program would be held by Fireman's Fund and paid to Company without interest on August 31, 1972, the end of the five-year period. *410 During this period, Company was required to use its own funds to finance the performance of its services as administrator of the AMA program. Effective September 1, 1972, Company's AMA contract was extended for an additional two years. On March 21, 1974, AMA advised Company in writing that its services as AMA's broker and administrator for the AMA program were terminated effective September 1, 1974. All of Company's other contracts for services as broker and administrator of group insurance plans were of one-year duration; Company usually received commissions on each of these other plans one, two, or three times a year. The amounts received by Company from its eight largest group programs, other than the AMA program, are shown in table 3. Table 3 Taxable Years Ended October 31,
Program
1963
1964
1965
American College of
Surgeons Disability
$295,023.11
$266,249.99
$330,941.82
California Medical
Assn. Disability
164,544.43
164,797.40
171,508.98
Texas Medical Assn.
Disability
108,233.51
65,677.63
118,468.40
American College of
Surgeons Major
Hospital
96,675.30
98,570.74
125,606.04
American Academy of
Pediatrics Disability
103,432.69
94,633.38
112,985.75
Chicago Medical
Socy. Disability
99,687.16
100,781.65
87,622.83
Southern Medical
Assn. Life
154,162.79
*
168,620.93
Southern Medical
Assn. Disability
129,555.54
*
123,330.58
Taxable Years Ended October 31,
Program
1966
1967
1968
American College of
Surgeons Disability
$340,258.13
$333,963.00
$291,010.96
California Medical
Assn. Disability
172,715.45
172,715.45
125,046.64
Texas Medical Assn.
Disability
105,396.10
122,026.94
149,065.66
American College of
Surgeons Major
Hospital
2,244.37
235,670.00
119,122.29
American Academy of
Pediatrics Disability
120,004.13
122,901.03
125,978.19
Chicago Medical
Socy. Disability
89,860.85
87,697.34
86,232.48
Southern Medical
Assn. Life
238,737.18
*
273,796.95
Southern Medical
Assn. Disability
124,968.54
*
118,843.40
*411 Company's expenses (excluding depreciation) for its taxable years ended October 31, 1963, through 1968, attributable to the Insurance Division, were not less than the amounts shown in table 4. Table 4 Year Ended
October 31,
Amount
1963
$800,000
1964
650,000
1965
700,000
1966
900,000
1967
650,000
1968
1,000,000
(2) Athletics Division
In 1962 Company made a proposal to the American League to move the Athletics from Kansas City, Missouri, to Dallas, Texas, beginning with the 1963 baseball season. The American League retained Arthur D. Little, Inc., to study the feasibility of such a proposed move. Arthur D. Little, Inc., issued a report on the subject, dated July 19, 1962 (hereinafter sometimes referred to as "the Little Report"), stating various findings, including the following: (a) Average attendance in Kansas City during the following five years 1963 through 1967 would be about 725,000--125,000 below the break-even level estimated in the Little Report. (b) At the expected level of attendance in Kansas City, losses before roster amortization and taxes would *412 aggregate $1,560,000 for the 1963 - 1967 seasons. The Little Report accepted Company's estimate that Company would have to pay $125,000 to cancel the remainder of the Kansas City lease. (This estimate was based on the language of the lease.) The Little Report stated that Company would have to pay more than the $250,000 that Company estimated to purchase the Dallas minor league team and to indemnify the relevant minor league for the loss of Dallas as a franchise city. The Little Report noted that Retson had provided information that Charles had spent about $500,000 for repairs and improvements to the Kansas City stadium in 1961 and 1962. The proposal to move the Athletics to Dallas, Texas, contemplated construction of a new stadium in Arlington, Texas, financed by the issuance of revenue bonds, by the Joint Board of Park Commissioners of Dallas and Tarrant Counties, Texas, and the repayment of the bonds through rentals payable by the Athletics pursuant to a thirty-year lease. The annual rental payable by Company during the first five years of the lease would have been a minimum of $1,000,000. The American League was not willing to approve a move by the Athletics in 1962. In 1964 *413 Charles asked the American League to consider his request to move the Athletics to Louisville, Kentucky. Table 5 shows annual expenses (except road, ticket sale, and game expenses) and income (loss) before taxes but including roster amortization, cumulative loss, and league standing for the Athletics for the taxable years ended October 31, 1961, through 1968. Table 5
Expenses
(Except road,
Taxable Year
ticket sale, and
Income
Cumulative
League
Ended October 31,
game expenses)
(Loss)
(Loss) [1]
Standing [2] *414 1961
$2,086,679
($819,000)
($819,000)
9 (tied)
1962
2,383,599
(1,883,000)
(2,702,000)
9
1963
2,085,256
(1,024,000)
(3,726,000)
8
1964
2,448,005
(720,000)
(4,446,000)
10
1965
2,391,360
(324,000)
(4,770,000)
10
1966
2,080,119
596,000 (4,174,000)
7
1967
2,080,053
(398,000)
(4,572,000)
10
1968
2,434,448
604,000 (3,968,000)
6 The amounts shown in table 5 as expenses include player development expenses (such as bonuses paid to sign, player contracts purchased from (or sold to) other teams, scouting expenses, and spring training for minor league players). The player development expenses were in the amounts shown in table 6. Table 6
Taxable Year
Ended
October 31,
Amount
1961
$744,239
1962
1,082,543
1963
895,438
1964
1,248,374
1965
1,065,095
1966
885,704
1967
608,462
1968
603,456
In October 1967, the American League granted Company approval to move the Athletics to Oakland, California. For the 1968 baseball season and thereafter, Company moved the Athletics to Oakland, California, and became a tenant in the Oakland-Alameda County Coliseum. The Stadium Baseball License Agreement dated March 29, 1968, between Company and the Oakland-Alameda County Coliseum, Inc., required Company to erect a scoreboard and message board suitable for football and soccer, as well as for baseball and other events, at its own expense. Company erected a scoreboard and message board in the Oakland-Alameda County Coliseum at its own expense *415 for a total cost of $985,400. Of this cost, about $400,000 was paid in Company's taxable year ended October 31, 1968, and the remainder in the next year. Relocation expenses amounted to $36,914 in Company's taxable year ended October 31, 1968. (3) Proposed Tax Deficiencies, Etc.
In reports dated June 16, 1967, February 22, 1968, and October 16, 1968, respondent's revenue agent proposed deficiencies in income tax, accumulated earnings tax, and penalties [13] against Company, as reflected in table 7. Table 7 I. Date of revenue agent's report: June 16, 1967 Taxable
Accumulated
Year Ended
Income Tax
Earnings Tax
Penalty [1]
Total
3/31/60
$ (63,691.95)
$ (63,691.95)
3/31/61
26,245.16 2,018.50
28,263.66 10/31/61
122,150.48 122,150.48 10/31/62
10/31/63
191,278.89 237,097.28
428,376.17 10/31/64
93,335.94 179,992.96
323.71
273,652.61 Totals
$369,318.52 $417,090.24
$2,342.21
$788,750.97  II. Date of revenue *416 agent's report: February 27, 1968 Taxable
Accumulated
Year Ended
Income Tax
Earnings Tax
Penalty [1]
Total
10/31/65
$69,998.12
$297,072.77
$18,353.54
$385,424.43
10/31/66
26,791.65
406,956.79
433,748.44
$96,789.77
$704,029.56
$18,353.54
$819,172.87
III. Date of revenue agent's supplemental report: October 16, 1968, superseding the amounts in II for the taxable year ended October 31, 1966 Taxable
Accumulated
Year Ended
Income Tax
Earnings Tax
Penalty [1]
Total
10/31/66
$ (6,548.83)
$397,597.12
$391,048.29
(4) Expansion into other sports
Charles first became interested in having Company acquire a hockey team in the 1960's, but none of the then existing teams was for sale. In 1966, six expansion franchises were sold by the National Hockey League (hereinafter referred to as "the NHL") for $2,000,000 each.In November 1967, Charles and one of his sons, who was a vice president of Company, met with Arthur M. Wirtz (hereinafter referred to as Wirtz"), the principal shareholder of the corporation which owned the Chicago Blackhawks hockey team, at Wirtz' office and discussed the possibility of Company entering into the hockey business. Wirtz told Charles and his son that there would be future expansion *417 in the NHL and that approximately $2,000,000 would be needed to buy an expansion hockey team and an additional $4,000,000 or so in working capital would be necessary to operate the team at that time.Charles anticipated Company needed $6,000,000 to $8,000,000 to buy an existing hockey team or $4,000,000 to $5,000,000 to buy and operate an expansion hockey team. On July 9, 1970, Company acquired the franchise of the Oakland Seals hockey team, a member of the NHL, for about $4,500,000, including the assumption of certain liabilities of the seller. This purchase was financed by borrowing money. Company operated this team as a separate division for three years. In July 1971, Company acquired the franchise of the Columbus Golden Seals hockey team for $54,964.82, which it operated as a separate division for one year. In May 1972, Company acquired the franchise of the Salt Lake Eagles hockey team, a member of the Western Hockey League, for a total price of $90,000. Company changed the name of the team to the Salt Lake Golden Eagles and operated it as a separate division for two years. Charles first became interested in having Company acquire a basketball franchise in the early 1960's. *418 He talked with various people in the basketball business, including Walter Kennedy, commissioner of the National Basketball Association (hereinafter referred to as "the NBA"), and Abe Saperstein, owner of the Harlem Globetrotters. In 1962, Charles talked with Dave Traeger, the owner of the Chicago Zephyrs basketball team, about possibly purchasing that team. He first talked with Robert Tinkham (hereinafter referred to as "Tinkham"), a trustee of the American Basketball Association (hereinafter referred to as "the ABA"), in early 1969 about the possibility of becoming an investor in an ABA franchise.He talked with Tinkham again in the spring of 1972 regarding the possible purchase of the Memphis franchise and was told to be prepared to lose $300,000 to $500,000 a year for a three-to-five year period, particularly since Memphis was then a new market. In July 1972, Company acquired the franchise of the Memphis Pros basketball team, a member of the ABA for approximately $275,000. Company changed the name of the team to the Memphis Tams and operated it as a separate division. Company incurred losses from the operation of the Memphis Tams in the amount of $634,938.44 for its taxable *419 year ended October 31, 1973, and in the amount of $328,145.04 for the four-month period ended February 28, 1974. b. Petitioners' Financial Data
Company's accumulated earnings and profits shown on its books and the increase in earnings and profits over prior years, from the taxable years ended October 31, 1962, through 1968, are set forth in table 8. Table 8 Taxable
Year Ended
Accumulated
Increase Over
October 31,
Earnings and Profits *
Prior Year
1962
$786,984
1963
1,066,583
$279,599
1964
1,366,920
300,337
1965
2,032,075
665,155
1966
3,133,083
1,101,008
1967
3,770,402
637,319
1968
4,440,132
669,730
The amounts of Company's year-end working capital [14] for the taxable years ended October 31, 1963, through 1968, are indicated in table 9. Table 9 Taxable Year Ended October 31,
1963
1964
1965
Current assets: Cash
$1,156,265
$1,748,529
$2,493,814
Short-term govt.
obligations
96,296
Notes and accts.
receivable
28,154
22,943
45,508
Inventory
16,220
20,109
23,785
Prepaid expenses
8,319
21,992
11,757
Deferred compensation
Advertising
76,312
Investments * --
American Canteen
and other stock
401,250
532,500
776,250
$1,610,208
$2,422,385
$3,447,410
Current liabilities: Accts. and notes
payable
$ 78,965
$ 88,046
$ 284,979
Withheld taxes
4,026
2,680
2,586
Accrued wages
985
1,541
Bonuses payable
60,500
22,000
Contracts payable
Provision for Federal
income tax
275,721
214,598
187,613
Deferred advertising
Rent payable
25,000
$ 420,197
$ 353,865
$ 475,178
Working capital
$1,190,011
$2,068,520
$2,972,232
*420 Taxable Year Ended October 31,
1966
1967
1968
Current assets: Cash
$1,571,310
$3,492,006 $4,566,617 Short-term govt.
obligation
143,524
Notes and accts.
receivable
89,207
30,952 339,950 Inventory
30,662
21,821 30,123 Prepaid expenses
9,137
19,971 9,564 Deferred compensation
45,000 Advertising
Investments * --
American Canteen
and other stock
1,886,365
367,156 $3,730,205
$3,931,906 $4,991,254 Current liabilities: Accts. and notes
payable
$ 77,921
$ 37,589 $ 279,390 Withheld taxes
3,045
2,847 238 Accrued wages
65,000 Bonuses payable
Contracts payable
584,700 Provision for Federal
income tax
563,820
(220,977)
(54,814)
Deferred advertising
24,838 Rent payable
$ 644,786
$ (180,541) 899,352 Working capital
$3,085,419
$4,112,447 $4,091,902 Company paid Charles compensation as its president for the taxable years ended October 31, 1963, through 1968, in the amounts shown in table 10. Table 10 Taxable
Year Ended
October 31,
Amount
1963
$120,000.00
1964
57,022.35
1965
78,000.00
1966
50,000.00
1967
130,000.00
1968
100,000.00 Company never made any loans to Charles. As reflected on their joint returns for 1963 through 1968, Charles' and Shirley's *421 taxable income and the marginal rates at which additional income would be taxed to them were as indicated in table 11. Table 11 Taxable
Year
Income
Marginal Rate
1963
$ 93,846.15
72%--91% for amounts over $400,000
1964
79,574.36
61%--77% for amounts over $400,000
1965
95,668.13
60%--70% for amounts over $200,000
1966
169,039.71
68%--70% for amounts over $200,000
1967
125,878.11
64%--70% for amounts over $200,000
1968 *
106,467.31
62%--70% for amounts over $200,000
Reasonable needs of the Insurance Division amounted to not less than $400,000 for each of Company's taxable years ended October 31, 1963, through 1965, and $600,000 for each of Company's taxable years ended October 31, 1966, through 1968. Reasonable needs of the Athletics Division for each of the years before us amounted to not less than $2,500,000; these needs could be expected to be offset by anticipated profits of the Insurance Division for the taxable years ended October 31, in the amounts of $800,000 (for 1963), $700,000 (for 1964), $600,000 (for 1965), $500,000 (for 1966), $400,000 (for 1967), and -0- (for 1968). In addition, reasonably anticipated needs to move the Athletics to another city amounted *422 to not less than $1,000,000 for each of Company's taxable years ended October 31, 1963, through 1967, and $600,000 for Company's taxable year ended October 31, 1968. Company's reasonably anticipated needs to meet proposed deficiencies in income taxes and additions to tax amounted to $800,000 and $1,600,000 for Company's taxable years ended October 31 of 1967 and 1968, respectively. OPINION I. Dividend or Loan Payment
Petitioners contend that Company's payments of $1,000,000 (in 1965) and $25,000 (in 1966) to Charles were repayments of loans relating to the $1,000,000 and $661,503.18 which he paid on behalf of Company in 1961 as to the Kansas City Bank loan and the Harris Bank loan, respectively. Respondent contends that Charles' 1961 payments on behalf of Company are contributions to Company's capital and that it follows that Company's payments to Charles are dividends. We agree with respondent. Under section 301, [15] a dividend distribution is includible in the shareholder's gross income; the fact that the distribution is not pro rata among the shareholders does not preclude such characterization and treatment. E.g., Garrison v. Commissioner,52 T.C. 281, 286 (1969); Gooding Amusement Co. v. Commissioner,23 T.C. 408, 422 (1954), *423 affd. 236 F.2d 159 (CA6 1956). On the other hand, the repayment of a loan (not in excess of the lender's basis) is not includible in the payee's gross income. E.g., Estate of Mixon v. United States,464 F.2d 394, 401-402 (CA5 1972). Determination of whether Company's payments to Charles are dividends or repayments of loans depends on whether Charles' payments on behalf of Company are contributions to capital or loans. This is a factual determination, as to which petitioners have the burden of proof. O.H. Kruse Grain & Milling v. Commissioner,279 F.2d 123, 125 (CA9 1960), affg. a Memorandum Opinion of this Court; [16]Arlington Park Jockey Club v. Sauber,262 F.2d 902, 905 (CA7 1959); *424 Malone & Hyde, Inc. v. Commissioner,49 T.C. 575, 578 (1968); 2554-58 Creston Corp. v. Commissioner,40 T.C. 932, 935 (1963). Many factors are relevant to such a determination, but no one element is essential. Fin Hay Realty Co. v. United States,398 F.2d 694, 696-697 (CA3 1968); O.H. Kruse Grain & Milling v. Commissioner,279 F.2d at 125-126; Arlington Park Jockey Club v. Sauber,262 F.2d at 905; Dixie Dairies Corp. v. Commissioner,74 T.C. 476, 493-494 (1980); Litton Business Systems, Inc. v. Commissioner,61 T.C. 367, 376-381 (1973). See Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 4.04, p. 4-10 (4th ed. 1979). The following indicia of capital contribution (and dividend) appear in the record: (1) There are no formal indicia of an obligation on Company's part to pay a debt to Charles. There are no contracts, notes, or loan agreements. The only contemporaneous writing the parties have pointed us to is Charles' notation, "Loan to Charles O. Finley + Co.", on the $1,000,000 Check; they have not pointed us to any contemporaneous writing as to the $661,503.18 transfer on account of the Harris Bank loan. (2) There was no *425 fixed maturity date or schedule of repayment for the amounts Charles paid on behalf of Company; the amounts were to be paid to Charles "at the earliest convenience." (3) Other than Company's $1,000,000 and $25,000 payments, as of 1978 there were no payments arguably relating to the amounts Charles paid on behalf of Company; Charles testified that no payments were made by Company because he did not need the funds and Company did need the funds for expansion into other sports. (4) Company did not agree to pay, or pay, any interest to Charles on these asserted amounts. (5) No formal security or collateral was provided to Charles as to these amounts. (6) As of 1978, Company had not paid any formal dividends to Charles or the other shareholders. (7) Although the asserted loans were made in connection with the acquisition of Athletics, Inc. (which became the Athletics Division), the asserted repayments were made by the Insurance Division and the New Plant Life Division. The following indicia of debt appear in the record: (1) Charles made notations on the $1,000,000 check to Kansas City Bank characterizing it as a loan; similar notations were made on the checks from Company to him for *426 $1,000,000 and $25,000, and on the check stub relating to the $25,000 check. (2) Company's income tax returns reflected the amounts of Charles' payments as loans to Company from shareholders. [17] (3) Company made payments to the extent of $1,025,000 within 5-1/2 years after Charles made his payments on its behalf, by checks indicating that they related to *427 Charles' payments. (4) Charles told Shirley that he regarded the amounts he paid as loans, and at the time Company's income tax returns were prepared, advised Retson similarly. The indicia reflect both contribution to capital/dividend and debt aspects as to Charles' payments on behalf of Company. Not only have petitioners failed to meet their burden of proof, but on balance, the indicia qualitatively favor a determination of contribution to capital/dividend. See Gilbert v. Commissioner,74 T.C. 60, 65 (1980). When Charles made the 1961 payments for Company, he sat on both sides of the table, so to speak. Charles created the ambiguous [18] situation we face; in so doing, in effect he invited respondent to characterize the payments in any way respondent wished. On this issue, we hold for respondent. [19] *428 II. Accumulated Earnings
a. General
Petitioners contend that Company's earnings and profits were not accumulated in excess of its reasonable business needs. Respondent contends to the contrary. We agree with petitioners. Section 531[20] *429 imposes the accumulated earnings tax on the "accumulated taxable income" of every corporation described in section 532. [21] In general, section 535 defines "accumulated taxable income" as taxable income with certain adjustments less: (1) the accumulated earnings credit under section 535(c) for earnings and profits retained for the reasonable needs of the business and (2) the dividends paid deduction of section 561. [22] *430 Section 533(a) provides as follows: SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX. (a) Unreasonable *431 Accumulation Determinative of Purpose.--For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary. The foregoing framework focuses on whether the corporation's earnings and profits for a year were accumulated in excess of the amount necessary to meet its reasonable business needs at the end of the year. The courts have refined this concept by not looking simply to the amount of earnings and profits accumulated but instead by looking to the assets available measured by available working capital to meet these reasonable business needs. Faber Cement Block Co. v. Commissioner,50 T.C. 317, 328-329 (1968). See Atlas Tool Co. v. Commissioner,70 T.C. 86, 120 (1978), affd. 614 F.2d 860 (CA3 1980). The courts look to the nature of the assets to which the accumulated earnings and profits are committed. [23]Atlas Tool Co. v. Commissioner,supra;Faber Cement Block Co. v. Commissioner,50 T.C. at 328; Bremerton Sun Publishing Co. v. Commissioner,44 T.C. 566, 582-583 (1965); *432 see Ivan Allen Company v. United States,422 U.S. 617, 628-629 (1975); Battelstein Investment Company v. United States,442 F.2d 87, 89 (CA5 1971). The amounts of the assets available to meet the reasonable business needs are compared to the amounts of the needs. b. Burden of Proof
Pursuant to section 534(b), respondent notified Company that a proposed notice of deficiency included an amount with respect to the accumulated earnings tax imposed by section 531 for the taxable years ended March 31, 1961, and October 31, 1963, through 1966. Company, pursuant to section 534(c), timely submitted a statement of grounds of which it relied to establish that its earnings and profits for the taxable years ended October 31, 1963, through 1966, had not been permitted to *433 accumulate beyond the reasonable needs of its business. Pursuant to section 534(b), respondent notified Company that a proposed statutory notice of deficiency included an amount with respect to the accumulated earnings tax imposed by section 531 for the taxable years ended October 31, 1967, and October 31, 1968. Respondent did not receive a statement responding to the latter notification. This Court determined that the burden of proof as to the accumulated earnings tax was not shifted to respondent, except with respect to the $1,000,000 and $25,000 paid to Charles as dividends or loan repayments (depending on our resolution of issue I, herein). c. Company's Business Needs
A determination of reasonable business needs is critical in two respects: (1) to compute the section 535(c) credit in calculating the accumulated taxable income and (2) to decide whether the presumption of a tax avoidance purpose under section 533 applies. The determination is a factual one ( Cheyenne Newspapers, Inc. v. Commissioner,494 F.2d 429, 432 (CA10 1974), affg. a Memorandum Opinion of this Court [24]; Herzog Miniature Lamp Works, Inc. v. Commissioner,481 F.2d 857, 861 (CA2 1973), affg. a Memorandum *434 Opinion of this Court [25] ; Battelstein Investment Company v. United States,442 F.2d 87, 88 (CA5 1971); Magic Mart, Inc. v. Commissioner,51 T.C. 775, 790 (1969); Faber Cement Block Co. v. Commissioner,50 T.C. at 329, and cases cited therein), as to which we are reluctant to substitute our business judgment for that of corporate management unless the facts and circumstances warrant our doing so ( Atlantic Properties, Inc. v. Commissioner,62 T.C. 644, 656 (1974), affd. 519 F.2d 1233 (CA1 1975); Faber Cement Block Co. v. Commissioner,50 T.C. at 329, and cases cited therein). Section 537 provides that "the term 'reasonable needs of the business' include the reasonably anticipated needs of the business." [26]
(1) Insurance Division
Petitioners contend that the reasonable business needs of Company's Insurance Division were "at least $2,000,000" for each of the taxable years ended October 31, 1963, through 1968, because-- (a) Charles was of the opinion that AMA desired *435 or required Company, as administrator of the AMA program, to have a net worth of $2,000,000. (b) Company needed funds to cover the expenses of the AMA program for the five-year period beginning November 1, 1967, when Fireman's Fund withheld commissions due to Company. Charles estimated cumulative past expenses of $1,300,000 for the program. (c) The Insurance Division's business was composed of "a relatively small number of insurance group programs" representing a substantial percentage of its income, thus, it had to protect itself in case of loss of such programs through competition. Respondent contends that "a generous allowance for working capital needs would be two month's expenses, or approximately $120,000", concedes that AMA would expect Company to be "financially sound" but not to the extent of a $2,000,000 net worth, and maintains that Company's section 534 statement indicates that it spent only $150,000 (not $1,300,000 as petitioners contend) on soliciting and retaining the AMA program. Petitioners bear the burden of proving that Company needed to accumulate $2,000,000 for the Insurance Division. The three reasons they advance overlap to some extent in terms of amount *436 needed. Reason (a), the amount of net worth desired or required by AMA is supported only by Charles' testimony that he estimated $2,000,000 based on "the questions that the insurance committee were asking me as to whether or not we were financially able to assume such a responsibility of administering their program and making it a success." Charles' testimony in this regard gives us no hint as to what AMA's questions were, as to whether AMA's negotiators set a figure, as to how Charles drew his conclusions from the negotiator's questions, or even as to whether Charles was telling us about the negotiations that led to the 1962 contract or those that led to the 1967 contract. Nevertheless, respondent concedes that Company would have to be "financially sound" to solicit and retain AMA as a client and needed two months operating expenses. The record in the instant cases, although voluminous, provides us only with vague information as to the Insurance Division's needs. Based on our estimates of the Insurance Division's expenses (with their sharp rise in Company's taxable year ended October 31, 1968), the general information as to frequency (although not seasonal pattern) of Company's *437 commission receipts, the substantial margin by which these receipts exceeded these expenses, and the efforts beginning in May 1966 to retain the AMA program, we conclude that the reasonable needs of the Insurance Division amounted to not less than $400,000 for each of Company's taxable years ended October 31, 1963, through 1965, and $600,000 for each of Company's taxable years ended October 31, 1966, through 1968. See Magic Mart, Inc. v. Commissioner,51 T.C. at 792. (2) Athletics Division
Petitioners contend that Company's reasonable needs and anticipated needs of the Athletics Division amounted to three to five million dollars and "an average figure of $4,000,000" for each of the taxable years ended October 31, 1963, through 1968, because-- (a) Ready capital was required in order to (1) pay expenses during that part of the year when revenues are not being received, (2) survive losses that often accompany poor won-lost records (see table 5 supra), and (3) be able to take advantage of opportunities to sign present or potential star players. (b) Funds had to be set aside to enable Company to move the Athletics to another city. Respondent contends that the reasonable needs of the *438 Athletics Division at no time required accumulations in excess of 60 days' operating expenses, yearly player development costs exceeded one million dollars only twice during the years before the Court, and the costs "required" by the Athletics' move to Oakland were only $36,914 (arguing that the cost of the scoreboard was in excess of that required for an ordinary scoreboard and was financed out of operating revenues). Respondent also argues that the anticipated profits of the Insurance Division could be expected to be used to meet the needs of the Athletics Division. The Little Report (dated July 19, 1962) estimated cumulative losses for 1963 through 1967 (if the Athletics remained in Kansas City) to be $1,560,000 (or about $312,000 per year). Actual cumulative losses for these years, including roster amortization, equalled about $1,870,000 (or about $374,000 per year); annual expenses (except road, ticket sale, and game expenses) for these years averaged about $2,217,000 (see table 5, supra). Charles testified that he estimated Company would need $5,000,000 to operate during that time period. As support for the amount of working capital needed to operate the Athletics, petitioners *439 called as witnesses Bill Veeck (hereinafter referred to as "Veeck") and Leland S. MacPhail (hereinafter referred to as "MacPhail"), both of whom have been involved with various baseball teams in several capacities for many years. MacPhail testified that, during the years 1963 to 1968 the owners of the Athletics should have had $2,000,000 in "liquid net worth as normal operating capital", and an additional $2,000,000 to $3,000,000 to deal with the problem of continuing losses, the need to invest heavily in player development, and the possibility of making capital improvements (such as a scoreboard or a stadium club) in either Kansas City or whatever other city the Athletics would move to. Veeck testified that his biggest financial problem in owning baseball teams was a need for cash, which prevented him from obtaining star players. He testified that he would have needed $2,500,000 to $3,000,000 to have avoided the financial disaster he incurred with his major league baseball club in St. Louis in 1954. From the foregoing, we conclude that the needs of the Athletics Division to: (1) pay expenses during that part of the year when revenues were not incoming, (2) survive losses, and (3) *440 take advantage of player opportunities, amounted to not less than $2,500,000 each year. We believe that respondent's assertion that anticipated Insurance Division profits could be used to meet these needs is well taken [27] *441 and is supported by findings in the Little Report. On the other hand, Charles' testimony as to the Insurance Division's needs convinces us that Company should have some latitude regarding the effect on anticipated Insurance Division profits if some insurance clients were to be lost. As we have noted, supra, we find the record on these points vague. Doing the best we can with the record we face, we conclude that, even in the light of Charles' fears he could reasonably anticipate that Company's Athletics Division needs could be offset by Insurance Division profits for the taxable years ended October 31, in the amounts of $800,000 (for 1963), $700,000 (for 1964), $600,000 (for 1965), $500,000 (for 1966), $400,000 (for 1967), and -0- (for 1968). As to reason (b) given for the Athletics Division needs (the Athletics' move to a different city), we note that the Little Report (as well as other evidence) indicates that Company spent more than $500,000 in repairs to the Kansas City stadium in 1961 and 1962, would have to pay $125,000 to cancel the Kansas City lease, and expected to pay at least $250,000 to the minor league team in the city to which the Athletics would move. The record indicates that from 1962 through the time of the Athletics' move to Oakland in 1968 Charles tried to convince the American League to approve a move of the Athletics from Kansas City. Finally, Company actually spent $36,914, in "Relocation Expenses" and $985,000 on the scoreboard relating to the move to Oakland. From this, we conclude that Company's business needs for the Athletics' move amounted to not less than $1,000,000 for the taxable years ended October 31, 1963, through 1967 and $600,000 for the taxable year ended October 31, 1968 (taking into account the fact that $400,000 of the scoreboard cost was paid in the latter year). (3) Proposed Tax Deficiencies, Etc.
Petitioners contend that Company had reasonable *442 needs to accumulate $1,048,000 and $1,934,000 in its taxable years ended October 31, 1967, and October 31, 1968, respectively, for its potential liability for income and accumulated earnings taxes, additions to tax (see n. 13, supra), and interest thereon, for the taxable years ended March 31, 1960, March 31, 1961, and October 31, 1961, through 1966. Respondent contends that: "the relatively small amount of the deficiencies in comparison with [Company's] surplus make it unlikely that [it] consciously set aside amounts for tax deficiencies", petitioners have not shown any specific determination by Company to meet this need, and nothing in the record indicates any plan or conscious thought as to interest on the proposed deficiencies. We agree with petitioners as to the amounts of taxes and additions to tax; we agree with respondent as to interest. We have recognized that a contingent liability is a reasonable need for which a business may provide, if the likelihood (not merely the remote possibility) of its occurrence would appear to a prudent business firm. Bremerton Sun Publishing Co. v. Commissioner,44 T.C. at 586; cf. J. Gordon Turnbull, Inc. v. Commissioner,41 T.C. 358, 374-375 (1963), *443 affd. 373 F.2d 87 (CA5 1967); see also Rev. Rul. 70-301, 1970-1 C.B. 138. The record, including Charles' testimony, convinces us that he was aware on Company's behalf of the above-described proposed deficiencies, and had Company set aside funds therefor, to the extent of the amounts in the revenue agent's reports. However, petitioners (who bear the burden of proof) do not direct us to anything in the record that persuades us that Charles acted on Company's behalf with respect to interest on the proposed deficiencies. From this, we conclude that Company's reasonable business needs for the proposed deficiencies amounted to $800,000 and $1,600,000 for its taxable years ended October 31 of 1967 and 1968, respectively (see table 7, supra). d. Business Needs Compared to Available Working Capital
Petitioners have advanced a variety of factors as giving rise to Company's business needs in order to cover all of the bases. As we assess the situation, it will suffice to concentrate on needs of the Insurance Division, of the Athletics Division, and for the proposed deficiencies. Table 12 compares our conclusions as to these needs with Company's working capital available to meet these needs *444 at year end. Table 12
(Amounts in thousands of dollars) Taxable Year Ended October 31,
1963
1964
1965
I. Needs
A. Insurance Division
$ 400 $ 400 $ 400 B. Athletics Division
1. Working Capital
1,700 1,800 1,900 ($2,500,000) reduced
by anticipated Insurance
Division profits)
2. Move to another city
1,000 1,000 1,000 C. Proposed tax deficiencies, etc.
Total needs
$3,100 $3,200 $3,300 II.Company's Working Capital
1,190 2,069 2,972 (table 9, supra)
III. Deficit
($1,910)
($1,131)
($ 328)
Taxable Year Ended October 31,
1966
1967
1968
I. Needs
A. Insurance Division
$ 600 $ 600 $ 600 B. Athletics Division
1. Working Capital
2,000 2,100 2,500 ($2,500,000 reduced
by anticipated Insurance
Division profits)
2. Move to another city
1,000 1,000 600 C. Proposed tax deficiencies, etc.
800 1,600 Total needs
$3,600 $4,500 $5,300 II. Company's Working Capital
3,085 4,112 4,092 (table 9, supra)
III. Deficit
($ 515)
($ 388)
($1,208)
e. Conclusion
We conclude that Company's reasonable business needs during the taxable years ended October 31, 1963, through 1968, significantly exceeded available working capital. These deficits are significant enough to make it unnecessary for us to consider other items which petitioners advanced as *445 necessitating their retaining earnings and profits. See Montgomery Co. v. Commissioner,54 T.C. 986, 1010 (1970); Faber Cement Block Co. v. Commissioner,50 T.C. at 334. We conclude that petitioners have sustained their burden of proving that the accumulations of Company's earnings and profits for the taxable years ended October 31, 1963, through 1968, were required by the reasonable needs of its business. This being our conclusion, we have no need to consider whether the proscribed purpose of avoiding income tax may have existed. Montgomery Co. v. Commissioner,supra;Magic Mart, Inc. v. Commissioner,51 T.C. at 799; Faber Cement Block Co. v. Commissioner,50 T.C. at 336; John P. Scripps Newspapers v. Commissioner,44 T.C. 453, 474 (1965). On this issue, we hold for petitioners. Because of remaining issues in three of these cases (see n. 5, supra), and concessions by the parties, Decision will be entered under Rule 155 in docket No. 8343-71.
An appropriate order reflecting the above opinion and continuing these cases to the general docket will be issued in docket Nos. 8342-71, 7219-73, and 7220-73.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Charles O. Finley and Shirley M. Finley, docket No. 8343-71; Charles O. Finley and Company, Inc., docket No. 7219-73; Charles O. Finley and Company, Inc., docket Nos. 8342-71 and 7220-73.↩
2. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the taxable years in issue.↩
3. The amount of the accumulated earnings tax for any year is included in the "Amount of Deficiency" column for that year. ↩
4. Petitioner Charles O. Finley and Company, Inc., changed its taxable year end from March 31 to October 31, resulting in a short taxable year from April 1, 1961, through October 31, 1961.↩
5. The Court severed and reserved for trial at a later date two issues (involving the allocation of basis to player contracts and depreciation of fixtures and equipment and leasehold improvements) in docket Nos. 8342-71, 7219-73, and 7220-73.↩
6. Another issue, whether net operating loss deductions for the taxable years ended March 31, 1960, March 31, 1961, and October 31, 1961, arising from a net operating loss for the year ended October 31, 1962, should be allowed to Company is solely derivative; its resolution depends on resolution of the severed issues as well as on the settled issues.
7. So stipulated. However, see Finley v. Commissioner,33 T.C. 753, 763↩ (1960).
8. Although the note stated that it was due in six months, Company prepaid a year's interest ($112,500). As a result of the loan prepayments noted infra,↩ Kansas City Bank refunded $34,187.50 of this interest in 1962. 9. The four corporations are (1) Company, owned as indicated in table 1, supra,↩ (2) Athletics, Inc., owned by Company, (3) Finley and Finley, Inc., with stock ownership identical to that of Company, and (4) Charles O. Finley and Company, Inc., of Indiana. 10. Company's business as broker and administrator of group insurance plans is described in the Findings of Fact infra, under II. Accumulated Earnings.↩
2. These amounts include the $661,503.18 amount paid by Charles on behalf of Company. ↩
3. These amounts exclude the $450,000 debt from Company to F & F.↩
1. Common stock and earned surplus. ↩
11. The August 10, 1961, note recited the same collateral as the February 10, 1961, note, notwithstanding that two of the four corporations whose stock had been pledged (see n. 9, supra↩) as collateral had in the meanwhile been merged into Company.
12. The difference between the $1,800,000, reflected as shareholder loans on Company's financial statements and income tax returns for the taxable years ended October 31, 1961, through 1964, and the $1,661,503.18, total of the Franklin stock sale proceeds and $1,000,000 check to Kansas City Bank, represents a loan from Charles O. Finley and Company, Inc., of Indiana (see n. 9, supra↩). Beginning with the taxable year ended October 31, 1965, that difference was separately reflected.
13. The creation and development of this aspect of Company's business is set forth at length in Finley v. Commissioner,supra.↩
*. The amount for each of these years was "roughly comparable" to the amounts for the immediately preceding and immediately following years.↩
1. Petitioners propose that we find (and the record contains some evidence showing) a $415,000 loss for 1960. Other evidence indicates income of $74,651. Neither side seeks to explain this difference nor how the 1960 results (whatever they are) affect Company's cumulative losses in view of Company's acquisition of Athletics, Inc., in January or February of 1961. ↩
2. There were 10 teams in the American League in each of these years. The Athletics' league standing for 1960 was eighth out of eight teams. (See n. 1 to this table.)
13. So stipulated. We assume that the parties are not referring to penalties, which are provided for in subchapter B of chapter 68 of the Internal Revenue Code of 1954 (see Helvering v. Mitchell,303 U.S. 391, 404-405↩ (1938)), but rather to additions to tax, which are provided for in subchapter A of this chapter.
1. See n.13 in text, supra.↩
*. These amounts are unchanged for any adjustments made by respondent in the notices of deficiency.↩
14. See Montgomery Co. v. Commissioner,54 T.C. 986, 1008↩ n. 7 (1970).
*. These investments were in "listed" common stocks, and are shown at their year-end fair market values.↩
*. Plus 1968 surcharge at 7-1/2% on tax.↩
15. Section 301 provides, in relevant part, as follows: SEC. 301. DISTRIBUTIONS OF PROPERTY. (a) In General.--Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c).
(c) Amount Taxable.--In the case of a distribution to which subsection (a) applies-- (1) Amount constituting dividend.--That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income.↩
16. T.C. Memo. 1959-110↩.
17. The underlying financial statements and workpapers prepared by Retson reflect the payments similarly. Although the financial statements in the Little Report reflect shareholders' loans of $1,800,000, the report states that Charles would agree to subordinate these loans. Charles testified that he did not recall this and would not have agreed to it. Because of these conflicts, we rely little, if at all, on how the amounts were reflected on the financial statements in that report. Charles also testified that in 1961 he was asked by Kansas City Bank to subordinate the amounts he paid on behalf of Company, but did not do so. He did not explain in what connection the request was made. This could indicate that he was having trouble obtaining financing from outside creditors. We have afforded it little weight as indicating debt.↩
18. Sometimes the parties' usual positions are reversed and it is the taxpayer that asks that the item be classified as equity rather than debt. See, e.g., Republic Supply Co. v. Commissioner,66 T.C. 446, 455 (1976), affd. per order (CA10 1978); Bittker & Eustice, supra,↩ par. 4.02, p. 4-6.
19. Because we reach the same conclusion as to both of the amounts paid by Charles on behalf of Company, we need not consider an argument suggested by respondent on brief that the amounts be considered separately and that there is no showing that the $1,000,000 check from Company to Charles relates to his $1,000,000 payment rather than to the $661,503.18.
20. SEC. 531. IMPOSITION OF ACCUMULATED EARNINGS TAX. In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the accumulated taxable income (as defined in section 535) of every corporation described in section 532, an accumulated earnings tax equal to the sum of-- (1) 27-1/2 percent of the accumulated taxable income not in excess of $100,000, plus (2) 38-1/2 percent of the accumulated taxable income in excess of $100,000. ↩
21. SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX. (a) General Rule.--The accumulated earnings tax imposed by section 531 shall apply to every corporation (other than those described in subsection (b)) formed or availed of for the purpose of avoiding income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed. (b) Exceptions.--The accumulated earnings tax imposed by section 531 shall not apply to-- (1) a personal holding company (as defined in section 542), (2) a foreign personal holding company (as defined in section 552), or (3) a corporation exempt from tax under subchapter F (section 501 and following). ↩
22. SEC. 535. ACCUMULATED TAXABLE INCOME. (a) Definition.--For purposes of this subtitle, the term "accumulated taxable income" means the taxable income, adjusted in the manner provided in subsection (b), minus the sum of the dividends paid deduction (as defined in section 561) and the accumulated earnings credit (as defined in subsection (c)). (c) Accumulated Earnings Credit.-- (1) General rule.--For purposes of subsection (a), in the case of a corporation other than a mere holding or investment company the accumulated earnings credit is (A) an amount equal to such part of the earnings and profits for the taxable year as are retained for the reasonable needs of the business, minus (B) the deduction allowed by subsection (b)(6). For purposes of this paragraph, the amount of the earnings and profits for the taxable year which are retained is the amount by which the earnings and profits for the taxable year exceed the dividends paid deduction (as defined in section 561) for such year. SEC. 561. DEFINITION OF DEDUCTION FOR DIVIDENDS PAID. (a) General Rule.--The deduction for dividends paid shall be the sum of-- (1) the dividends paid during the taxable year, (2) the consent dividends for the taxable year (determined under section 565), and (3) in the case of a personal holding company, the dividend carryover described in section 564.↩
23. Of course, investment in nonliquid assets which are unrelated to, or unnecessary for, the corporation's business will not enable the corporation to avoid the section 531 tax. See Ivan Allen Company v. United States,422 U.S. 617, 630 n. 11 (1975); Faber Cement Block Co. v. Commissioner,50 T.C. 317, 328↩ (1968). Respondent does not contend that Company had any such unrelated nonliquid assets during the years before the Court.
24. T.C. Memo. 1973-52↩. 25. T.C. Memo. 1972-173↩.
26. The subsequent amendment of this provision by section 906(a) of the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 487, 714, does not affect the taxable years before us.↩
27. World Pub. Co. United States,169 F.2d 186, 189 (CA10 1948); Battelstein Investment Company v. United States,442 F.2d 87, 89 (CA5 1971); Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 8.04, p. 8-23 (4th ed. 1979).