Jerome E. CASEY, Transferee of the Bankers Development Corporation, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 181, Docket 25355.

United States Court of Appeals Second Circuit.

Argued Feb. 11, 1959.

Decided May 11, 1959.

Robert W. Brady, Newark, N. J., for petitioner.

Kenneth E. Levin, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson and Robert N. Anderson, Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before HAND and LUMBARD, Circuit Judges, and MADDEN, Judge, United States Court of Claims.*

MADDEN, Judge.

The petitioner Casey in 1953 acquired all the assets of Bankers Development Corporation, and thereby became liable for Bankers' unpaid taxes. The Tax Court held that Bankers had incurred corporate surtax liability for its taxable year ended April 30, 1950, under section 102 of the Internal Revenue Code of 1939 (26 U.S.C. 1952 Ed., § 102). Section 102(a) imposes a tax, in addition to the taxes normally imposed upon corporations, upon the income of a corporation if the corporation is "availed of" for the purpose of preventing the imposition of a surtax upon its shareholders. The thought of section 102 is, of course, that if a corporation has made profits, and has no corporate business reason for not distributing them as dividends to its shareholders, but nevertheless does not distribute them because the dividends, if distributed to the shareholders, would be subject to individual income taxes at surtax rates, the corporation should be subjected to an additional tax to compensate for the taxes which the shareholders have escaped from paying.

To determine whether a section 102 tax should be imposed, the first inquiry is whether the corporation, which has net income in its treasury, has a business reason for not distributing that net income as a dividend to its shareholders. If that inquiry results in a determination that there is no business reason for the accumulation of the corporation's profits, then section 102(c) is applicable. It provides:

"(c) *Evidence determinative of purpose.* The fact that the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary."

In the instant case, as perhaps in most section 102 cases, the real controversy is as to the presence or absence of a business reason for accumulating rather than distributing the corporate earnings. The petitioner insists that there was such a business reason. The Tax Court held that there was not.

Bankers Development Corporation was formed in 1920. Its principal business

* Sitting by designation pursuant to the provisions of 28 U.S.C. § 291(a).

for the first 20 years of its existence was the soliciting, at a fixed fee per depositor, of new depositors for banks. The petitioner Casey was employed by Bankers, as a solicitor, in 1923, and was continuously connected with Bankers until he in 1953 dissolved the corporation, having become, in 1951, its sole stockholder.

The petitioner served Bankers as a solicitor from 1923 until 1928 when he became the supervisor of new account solicitation operations. The business of Bankers fell off greatly in the 1930's, although such employees as Bankers still had work for, including the petitioner, prospered. In 1939 Bankers was in a precarious financial condition. The petitioner and one Owen, a lawyer, each purchased 50 percent of Bankers' stock.

In the 1930's banks began to impose service charges upon their checking account customers who did not maintain a balance sufficient to compensate the banks for carrying the account. The imposition of the service charge was an irritation to the customers, and the banks sought some other less irritating method of getting paid for servicing small accounts. The method which they devised was to charge the depositor a fixed sum per check for his checks. His checks would then be honored, so long as he had funds in the bank, and no matter how small his balance was, no further service charge would be made. In order for the bank to keep separate account of the two kinds of deposits, the checks which had been paid for in advance had to have some identifying markings on them such as "Special Checking Account" or some special numbering.

Perhaps because the legend "Special Checking Account" was an indication that the drawer was relatively impecunious, an important bank conceived the idea of simply printing the customer's name on the checks sold to him. This would give to those who saw his checks the impression that he was a depositor of distinction, rather than that he was a depositor with a small balance. And it would, of course, be just as useful to the bank in sorting its checks as some

telltale legend such as "Special Checking Account."

Bankers Development Corporation saw an opportunity to supply the equipment which banks would need in order to print the names of special account customers on their checks. The printing would have to be done at the bank, at the time that the depositor was opening his account. Only a small number of checks, such as 20, would be printed for each customer. Bankers Development discovered a small and inexpensive machine which was being made by the Multigraph-Addressograph Company for use by stationery stores for printing the names of their customers on stationery. Bankers in 1939 made a contract with a large bank to furnish it one of these machines, the bank to pay Bankers $1.50 for the first book of 20 checks sold to a depositor, and one cent per check for additional books of 20 checks sold to the same depositor. This experimental contract with the first bank led to other contracts with other banks. Bankers system, which it called the "ThriftiCheck" system, which in April 1940 was in use in only five banks, was adopted by additional banks each year until in April 1950 it was in use in 170 banks. From 1943 on, Bankers derived at least 90 percent of its income from its ThriftiCheck operations.

The setting by hand of the type for printing bank customers' names on the checks, the hand feeding and cranking of the small printing machines in the banks naturally left room for improvement. A power operated automatically fed press was desirable, as was also some method of avoiding the hand setting of type for each printing of a small number of checks. Serious competition developed for Bankers. In 1948 a competitor displayed an automatic printing machine, and Bankers, between that time and 1950 lost several customers to this competitor.

In 1949 Bankers entered into an agreement with a manufacturer named Seal-O-Matic whereby that company agreed to develop an automatic printing machine for Bankers and deliver six models for display at the American Bankers Asso-

ciation Convention. The demonstration of the machines was successful, but the machines nevertheless had defects which Seal-O-Matic was not willing to eliminate except on conditions which Bankers would not accept. Seal-O-Matic's engineer who had worked on the model machines resigned from that firm and became associated with another company which offered to produce the desired machines if Bankers would finance the production.

Owen, who, as we have seen, owned 50 percent of the stock of Bankers, the other 50 percent being owned by the petitioner, was unwilling to invest more than $50,-000 of Bankers' money in the development of the new machines. He was not certain enough that the machines would be satisfactory to be willing to risk a larger amount of Bankers' accumulated surplus. In addition to the $50,000 which Bankers loaned on April 27, 1950 for the development and production of the new machines, the petitioner personally loaned $50,000 or more. The manufacturer produced 130 of the 150 machines promised, and they were not satisfactory. As we have seen, the petitioner acquired Owens' stock in 1951. In that year Bankers discovered another manufacturer which, in 1952 and thereafter produced for Bankers a satisfactory printing machine.

After the low point in its financial position which Bankers reached in 1939, its financial position, as shown on its own books, steadily improved, from an accumulated deficit of $41,487.02 in 1939 to an accumulated surplus of $181,526.31 on April 30, 1951.

The Commissioner of Internal Revenue determined that the petitioner as transferee of Bankers Development Company was liable for a section 102 surtax for each of the years ending April 30, of 1948, 1949 and 1950. The petitioner sought relief in the Tax Court, and that Court decided that there was no section 102 liability for the tax years ending in 1948 and 1949, but that there was such liability for the tax year ending April 30, 1950. The petitioner seeks review and reversal of the decision as to the tax year ending in 1950. The Commissioner of Internal Revenue does not seek review of the decision, adverse to him, as to the years ending in 1948 and 1949.

A matter of importance in the instant litigation has to do with Bankers' potential liability, during the years in question, to the estate of Brian T. Moran. Mr. Moran was employed by Bankers as a salesman in 1940, on a commission basis, and was so employed until his death in 1945. His estate claimed commissions on money received by Bankers after Moran's death under contracts made in his lifetime, and, upon Bankers' refusal to pay such commissions, the representative of the estate brought suit. The litigation was not determined until the Court of Appeals of the State of New York held, in 1954, that Bankers was not liable to the estate. Bankers, in its income tax returns for its tax years ending in 1948, 1949 and 1950 claimed deductions from income of the amounts which it would have to pay the estate if there was liability. The Commissioner of Internal Revenue in 1955 denied these deductions and Bankers paid the resulting deficiencies.

The Tax Court, in deciding the section 102 question, recognized that it was proper for Bankers to charge itself with these potential liabilities to Moran's estate, which liabilities increased from year to year, reaching the accumulated amount of $43,825.14 in the year ending April 30, 1950, the year here in question. The petitioner in computing its accumulated earnings and as of the end of the year in question would deduct the $43,825 of potential liability to Moran's estate, and arrive at a figure of $130,145.57. The Tax Court did not make the deduction, and hence its figure was $173,970.-71. But it held that there was a proper business purpose for the corporation's retaining the amount of the potential liability in its treasury, so there is no disagreement between the parties as to this item.

Bankers had from the time of its incorporation in 1920 carried among its book assets an item of $26,640.60 designated as "Goodwill (including unoperat-

ed portion of signed contracts)." This asset was the assigned value of its contracts for the solicitation of depositors for banks. The asset had become practically worthless but had never been written off. The Tax Court held that money retained in the treasury to compensate for the inevitable writeoff of this item should not be treated as an unreasonable accumulation.

With the $43,825.14 and the $26,640.60, discussed above, deducted from the $173,970.71 of accumulated surplus, there remained $103,504.97, available for consideration by the Tax Court as to whether its retention was an "accumulation beyond the reasonable needs of the business." The Tax Court held that the only other need of the business was the replacing of printing machines, and that $50,000 was an adequate amount for that purpose. The Tax Court held, therefore, that the remaining $53,504.97 was an excessive accumulation, subject to the section 102 surtax.

The case has its difficulties. In the competitive situation in which the plaintiff found itself in 1950 it might well have contemplated the prudent expenditure, in the near future, of considerably more than the $50,000 allowed by the Tax Court. If, for example, it had found a manufacturer which could produce for it a completely satisfactory automatic printing machine, it might wisely and safely have invested in a large number of such machines. Indeed, it is hard to see how it could have expected to hold its 170 accounts, furnishing them either its old type hand-operated machines or an unsatisfactory automatic machine, if one of its competitors came out with a satisfactory automatic machine. In spite of the goodwill which the plaintiff seemed to have enjoyed with its customers, it would seem that its position was somewhat precarious, although its operations had been profitable up to that time.

The Commissioner urges that, since Owen refused to agree to the expenditure of more than $50,000 for the development of a new machine, and since Owen had a veto power over corporate action, there was no possibility of spending more than the $50,000 actually spent, and the other $53,504.97 should have been distributed. Owen was pessimistic about the possibility of obtaining a satisfactory machine. The petitioner was hopeful, and in 1951 he discovered a manufacturer who could make one. The petitioner had a veto power over the declaration of dividends and thus could keep money in the corporate treasury for the protection and expansion of the business.

Prior to the enactment of certain statutes which we will now advert to, a determination by the Commissioner of Internal Revenue that a corporation had allowed its earnings or profits to accumulate beyond the reasonable needs of the business would have carried a presumption of its own correctness, and the taxpayer would have had the burden of rebutting that presumption. Section 534 of the Internal Revenue Code of 1954, in its paragraphs (a) (2) and (c), 26 U.S.C. § 534(a) (2), (c), provides that in circumstances present in the instant case the Commissioner should have the burden of proving the fact of the asserted unreasonable accumulation. And by the Act of August 11, 1955, c. 805, 69 Stat. 689, 690, section 4, the above provision of the 1954 Code was amended to make it retroactive and applicable "in the case of proceedings tried on the merits after the date of the enactment of this paragraph." The 1955 amendment is applicable to the instant case.

The Commissioner of Internal Revenue then, had the burden of proof that Bankers had unreasonably accumulated profits. We think that the 1954 and 1955 enactments indicate that Congress did not want the taxing authorities to be second-guessing the responsible managers of corporations as to whether and to what extent profits should be distributed or retained, unless the taxing authorities were in a position to prove that their position was correct. This recent expression of Congress should, perhaps, have some bearing upon our approach to our review of the Tax Court's decision.

Review of Tax Court decisions by the Courts of Appeals is subject to the same limitation as is review of decisions

of District Judges sitting without a jury. 26 U.S.C. § 7482. That means that, under Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.,

"Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

In the instant case the evidence was largely stipulated or documentary and there was no real dispute which depended, for its resolution, upon the credibility of witnesses. The plaintiff cites numerous cases to the effect that, in that situation a decision which, the appellate court thinks, is contrary to the preponderance of the evidence, is "clearly erroneous."

■ The discussion by the late Judge Jerome Frank of this Court in Orvis v. Higgins, 2 Cir., 180 F.2d 537 is an excellent analysis of this problem. Judge Frank adverted to the language of the Supreme Court of the United States in United States v. United States Gypsum Co., 333 U.S. 364, 394, 68 S.Ct. 525, 542, 92 L.Ed. 746, that:

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."

Other pertinent precedents are Wigginton v. Order of United Commercial Travelers, 7 Cir., 126 F.2d 659; Smith v. Royal Insurance Co., 9 Cir., 125 F.2d 222; State Farm Mutual Automobile Insurance Co. v. Bonacci, 8 Cir., 111 F.2d 412; Carter Oil Co. v. McQuigg, 7 Cir., 112 F.2d 275.

The Commissioner of Internal Revenue seems to urge that there is something about cases of surtaxes on accumulated earnings which peculiarly narrows the scope of the review which the Courts of Appeals may make. He cites first the decision of this Court in Trico Products Corp. v. McGowan, 2 Cir., 169 F.2d 343, 344. But it must be noted that in that case, Judge Swan for the Court expressly wrote:

"Even on the assumption that, because this is an appeal from the District Court, we could reverse the finding, without determining it to be 'clearly erroneous,' that Trico's earnings were accumulated beyond the reasonable needs of the business, *nothing has been advanced which persuades us that it should be reversed."* (Italics supplied.)

Obviously the Court did not have "a definite and firm conviction that a mistake had been committed.", United States v. United States Gypsum Co., supra, since the Court thought that the decision appealed from was right. An examination of the other cases cited by the Commissioner, see Helvering v. Nat. Grocery Co., 304 U.S. 282, 58 S.Ct. 932, 82 L.Ed. 1346; Helvering v. Chicago Stock Yards Co., 318 U.S. 693, 63 S.Ct. 843, 87 L.Ed. 1086; Gibbs & Cox v. Commissioner, 2 Cir., 147 F.2d 60; KOMA, Inc. v. Commissioner, 10 Cir., 189 F.2d 390; Pelton Steel Casting Co. v. Commissioner, 7 Cir., 251 F.2d 278, certiorari denied 356 U.S. 958, 78 S.Ct. 995, 2 L.Ed.2d 1066; Whitney Chain & Mfg. Co. v. Commissioner, 2 Cir., 149 F.2d 936; Latchis Theatres of Keene v. Commissioner, 1 Cir., 214 F.2d 834, seems to us to show that the reviewing courts, while using language indicating that they had a restricted scope of review, in most cases at least would have made the same decision as the one under review.

In the instant case we think, as we have indicated, that there was much reason why the $53,504.97, the amount really in dispute here, should have, in the corporation's situation, been held in the treasury. If a board of directors had debated this question and concluded not to declare a dividend, its conclusion would have seemed rational. In the instant case, because of the equal division of the stock between the petitioner and Owen, we have the situation where the petitioner wants to spend the earnings for new machines, and Owen will not agree to that. That leaves the money in the treasury, but it does not tend to show that it would have been unreasonable for

the corporation to have spent the money for the machines, or to hold the money to have it available to spend for the machines.

There is the other element in section 102, the purpose of avoiding the payment of surtaxes by the shareholders. Section 102(c) makes the Commissioner's task easy on that feature of the case, by imposing on the taxpayer the burden of proving by a clear preponderance of the evidence that the purpose of an accumulation of profits beyond the reasonable needs of the business is other than a purpose of keeping the shareholders free of surtaxes. In the ordinary situation, the presumed motive of the accumulation is the one that logic and experience would lead to. But if, as in the instant case, the funds are accumulated because of a deadlock between two equal shareholders as to whether to spend them or not, and no particular thought seems to have been given to dividends or surtaxes, the presumption of motive does not seem to fit.

▄ Our review of the case leaves us "with the definite and firm conviction" that the Tax Court erred in holding that Bankers accumulated profits beyond the reasonable needs of its business in the year in question. The decision of the Tax Court is therefore

Reversed.

HAND, Circuit Judge (concurring).

▄ Subdivision (a) of § 533 of the Code of 1954, like its predecessor, § 102 (c), declares that "the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary." In the case at bar the difficulty, as I view it, is in determining what were the "reasonable needs" of the corporation in the year ending April 30, 1950. If we are to judge these by what happened afterwards they included the retention of all the assets then possessed by the corporation. Without Casey's added personal loan of $50,000 it is clear that the corporation's experimentation could not have continued, so that Casey at least did not think that the existing accumulation was not reasonably needed for the enterprise in which he and Owen were involved. I believe that the statute meant to set up as a test of "reasonable needs," only the corporation's honest belief that the existing accumulation was no greater than was reasonably necessary. Section 532(a) was a penal statute, designed to defeat any plan to evade the shareholders' taxes, and there can be no doubt that it presupposes some deliberate purpose to do so and is not satisfied by proving that the corporation was mistaken in its estimate of its future "needs."

In the case at bar the embarrassment is in deciding what were those "needs," and for that one must look to the estimate of those in control of the corporation, because, being an artificial person, it could obviously have no independent estimate. The trouble here is that during the year in question there were only two shareholders, and they were at odds. Casey thought that the corporate "needs" included not only keeping unimpaired the existing assets, but even adding to them, as he did by $50,000 of his own money. Owen was willing to allow the corporation to invest $50,000 in a new machine, but he refused to consent to anything more. Hence, so far as I can see, the Commissioner did not prove what were the "needs" of the corporation and that was a condition upon his finding that the retained assets exceeded them. The situation is not likely to occur again, for it is seldom, if ever, that those in charge of a corporation—usually the board of directors—is evenly divided, but I see no escape here from reversing the order of the Tax Court unless, as I have said, by setting up a standard of what are "reasonable needs" that is independent of the opinion of those in control. For that reason I concur in reversing the order.

LUMBARD, Circuit Judge, concurs in the opinion of MADDEN, Judge, and in this opinion as well.