**ATLANTIC PROPERTIES, INC., Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

No. 74–1439.

United States Court of Appeals, First Circuit.

Argued May 7, 1975.

Decided Aug. 11, 1975.

David H. Halpert, Boston, Mass., with whom Gadsby & Hannah, Boston, Mass., was on brief for appellant.

Louis A. Bradbury, Atty., Tax Div., Dept. of Justice, with whom Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews and Richard Farber, Attys., Tax Div., Dept. of Justice, were on brief, for appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

This is an appeal from a decision of the United States Tax Court, 62 T.C. No. 73 (1974). We affirm. Since that court's opinion contains a thorough presentation of the facts and discussion of the law, we confine ourselves only to such a summary as will make the issue intelligible.

The challenged holding is that taxpayer, a Massachusetts corporation engaged in the management and rental of some twenty aging industrial buildings, is subject to the accumulated earnings tax imposed by section 531 of the Internal Revenue Code of 1954, 26 U.S.C. § 531, for the fiscal years 1965–1968. The corporation was organized in 1951 on a basis which can be called either fail-safe or deadlock-guaranteed: stock was issued in four equal blocs, with an 80 per cent vote of all the stock being necessary to approve any "resolution, purchase, sale, lease, contract . . . proceeding or act by the Board of Directors or by any officer."

The property was purchased in 1951 at a cost of $300,000. During the ensuing years receipts from earnings and sales of some of the real estate placed the corporation in a highly liquid condition. For the tax years in question the ratio of current assets to liabilities varied from a low of 7.2 to 1 to 19.3 to 1 and earned surplus increased from $268,965 in 1965 to $352,354 in 1968. Very early in the life of the corporation a profound disagreement developed between the holders of 75 per cent of the stock and Dr. Wolfson, a 25 per cent owner. The former felt that dividends should be declared, while the latter felt that the property should be repaired and improved.

As an inevitable result, meetings of the directors were often acrimonious and chaotic, salaries were authorized only in 1959 and 1960, and dividends (of $10,000) were paid in only 1964 and 1970. In 1962 an engineering firm made a general estimate of recommended repairs. These, including work on some buildings which have since been demolished, totalled $296,000. Nothing was done in any organized way to implement the recommendations; the corporation made repairs based on urgent need.

The Tax Court held that the corporation had not submitted such an explanatory statement of its reasonable needs as to shift the burden of proof to the government, 26 U.S.C. § 534(a). The statements submitted were those of the warring blocs, not the corporation's; they were not specific; and, the court added, even had the burden shifted, the Commissioner had demonstrated an unreasonable accumulation. This finding is not disputed on appeal.

This fact having been established, it was the taxpayer-corporation's burden, under section 533, to prove by a preponderance of the evidence that it had not been "availed of for the purpose of avoiding the income tax with respect to its shareholders . . . by permitting earnings and profits to accumulate instead of being divided or distributed." Section 532(a). The corporation claims that it has met its burden by showing the near quarter century deadlock between Wolfson and his co-stockholders.

The Tax Court acknowledged the deadlock but held that, while it absolved the holders of 75 per cent of the stock of any tax avoidance purpose, Wolfson's tax avoidance motive was enough to place liability on the corporation. The court found evidence of such a motive in the fact that in Wolfson's high tax bracket during the tax years in question it would have been to his advantage to avoid additional income;[1] in Wolfson's having asked other directors if he could give his stock to a charitable foundation he had established—which gift would have given him the benefit of appreciated value;[2] and in Wolfson's lack of any definite or feasible plan for use of the accumulated earnings. Wolfson relied only on the 1962 general survey; he ap-

parently did nothing over the years to reduce a general strategy to a practicable, staged, priority conscious plan of capital improvement in an effort to persuade the other stockholders. Cf. Oklahoma Press Publishing Co. v. United States, 437 F.2d 1275, 1279 (10th Cir. 1971). Indeed, our reading of some of the corporate minutes for 1967 indicates that the dispute over repairs had long since been elevated to a theological discussion, with no practical implications.

We cannot say that the finding as to a tax avoidance motive on the part of Wolfson was clearly erroneous. Our chief inquiry here is whether a deadlock between Wolfson and the remaining stockholders, with Wolfson so tainted, is proof by a preponderance of the evidence that the taxpayer corporation was not availed of to avoid income taxes.

Taxpayer relies heavily on Casey v. Commissioner, 267 F.2d 26 (2d Cir. 1959), which involved a deadlock between two half owners of the stock of a corporation. One wished to spend most of $103,504 of accumulated earnings on a new automatic printing machine; the other refused to allow more than $50,000 to be so spent. The court of appeals reversed a Tax Court ruling that the corporation had accumulated funds beyond its reasonable needs. First noting that the Commissioner had the burden of proving an unreasonable accumulation, it observed that the issue dividing the co-owners was the possibility of finding a machine which would serve their purpose, one being pessimistic, the other optimistic. In fact, a year later the optimistic partner, having bought out the other's share, found an acceptable machine. In such a case, the court said, leaving the money in the treasury "does

---

1. On appeal taxpayer for the first time presents a chart to show that had each year's earned accumulations been distributed to Wolfson, he could, by taking advantage of available unused ordinary losses, have received dividends in 1965 and 1966 at only a nominal tax cost. This is ingenious retrospective advocacy but, even if we were to take note of it, is underinclusive as to years and as to the reasons relied on by the Tax Court.

2. We note but do not rely upon a similar possible motivation, not mentioned by the Tax Court. Wolfson testified that he had begun his practice in 1922. By the years 1965–1968, he would have been at least 67 or 68 years old. Solely in a tax avoidance sense, time was on Wolfson's side. Simply by waiting, he could eventually assure the transfer of appreciated value, without income tax diminution, to his estate.

not tend to show that it would have been unreasonable for the corporation to have spent the money for the machines, or to hold the money to have it available to spend for the machines." *Id.* at 31–32. While this holding made it unnecessary to consider whether the taxpayer had proven that an unreasonable accumulation was not for a tax avoidance purpose, the court added the thought that if funds are "accumulated because of a deadlock between two equal shareholders as to whether to spend them or not, and no particular thought seems to have been given to dividends or surtaxes, the presumption of motive does not seem to fit." *Id.* at 32.

The instant case differs from *Casey* in two important respects. First, the unreasonableness of the accumulation being uncontested, it is the taxpayer, not the Commissioner, which has the burden of rebutting a presumption of a "purpose to avoid the income tax with respect to the shareholders", section 533(a). Second, in *Casey* there was no finding, as there is here, that one of the co-owners had a tax avoidance motive. Although *Casey* does not compel a ruling for taxpayer here, neither does it offer affirmative help for the government. Nor is *United States v. The Donruss Co.*, 393 U.S. 297, 89 S.Ct. 501, 21 L.Ed.2d 495 (1969), conclusive. In that case the Supreme Court held that, as a predicate for surtax liability, tax avoidance need be only one motive of a taxpayer, not the only or dominant motive. We are left with the question whether Wolfson's intransigence, coupled with his motive to avoid taxes, should subject his long complaining fellow stockholders to accumulated earnings tax liability.

It is difficult, in a deadlock situation, to speak of a corporate purpose. By definition the corporation is frustrated from having a purpose. But the statute, section 532(a), speaks of a corporation being "availed of" for such a purpose. Were a corporation, by vote of a majority, however close the vote, to forestall dividends and thus to cause earnings to accumulate unreasonably, there is no doubt that pro-

testing stockholders and directors would be held liable. The law would not give weight to their personal preference for dividends. In the case at bar the participants, deliberately if not with the wisdom of hindsight, created a corporation in which a holder of 25 per cent of the stock could effectively exercise majority power in vetoing virtually any affirmative act or resolution. By his exercise of such a power, such a minority holder serves his own tax avoidance purposes and imposes on his colleagues an unwilled avoidance of income tax. We see no alternative to imposing liability on all the stockholders other than that of granting immunity to all stockholders of a closely held corporation whenever one of them, with power of veto, chooses to use it for tax avoidance purposes. This, it seems to us, creates a new and unnecessary tax loophole and puts the burden on the general citizenry, who, after all, had nothing to do with creating the vehicle.

*Affirmed.*