T.C. Memo. 2003-250

UNITED STATES TAX COURT

ADVANCED DELIVERY AND CHEMICAL SYSTEMS NEVADA, INC., Petitioner
v. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8852-00.                    Filed August 20, 2003.

Donald P. Lan, Jr., for petitioner.

Candace M. Williams, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, Judge:  Respondent determined deficiencies in
petitioner's Federal income taxes for petitioner's short taxable
year beginning October 8 and ending December 31, 1996, and for
petitioner's short taxable year beginning January 1 and ending
October 10, 1997, as follows:

| Short Taxable Year Ending | Deficiency |
|---|---|
| Dec. 31, 1996 | $ 494,101 |
| Oct. 10, 1997 | 1,578,112 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issue for decision is whether petitioner is subject to the accumulated earnings tax for the above short taxable years.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner, a Nevada corporation, was incorporated on June 13, 1996. At the time the petition was filed, petitioner maintained a registered address in Las Vegas, Nevada.

Petitioner is the successor to Advanced Delivery & Chemical Systems, Inc. (ADCS), an Illinois corporation that was incorporated on March 22, 1988, and that merged into petitioner on July 9, 1996. On October 10, 1997, petitioner was acquired by ATMI Holdings, Inc. (ATMI), a public company.

Stephen H. Siegele, a chemical engineer, was the founder of and primary stockholder in ADCS. From 1988 until its merger into petitioner on July 9, 1996, ADCS was engaged in the business of developing, manufacturing, and marketing ultra high purity chemicals for use in the computer industry. The primary chemical

product manufactured and sold by ADCS was tetraethylorthosilicate (TEOS), which is used as an insulating and conducting material on semiconductor computer chip wafers.

In 1988, Siegele started up ADCS with an initial capitalization of $150,000. Initially, ADCS maintained its small laboratory and manufacturing plant in Amherst, Wisconsin, and its sales office in Siegele's apartment in San Jose, California. Beginning with its first year of operation, ADCS was successful and profitable.

In 1990, with a $72,000 10-year commercial bank loan which it had obtained, ADCS purchased approximately 1.8 acres of land in Burnet, Texas, on which ADCS constructed a new 3,000- to 4,000-square-foot manufacturing plant into which ADCS relocated its laboratory and manufacturing plant that had been located in Amherst, Wisconsin. The $72,000 bank loan was paid off in 1993.

In the early 1990s, ADCS developed and began manufacturing stainless steel canisters that allowed for safe handling and processing of TEOS and of other chemicals used in the computer industry.

In the mid-1990s, ADCS developed and patented, and then began manufacturing and selling, a dual canister chemical refilling system that allowed TEOS and other chemicals to be continuously applied to computer chip wafers through a processing tool without interrupting the chip manufacturing process while

the chemical canisters were being refilled.  ADCS' startup costs for manufacturing the dual canister refilling system were approximately $1.1 million.

By the mid-1990s, ADCS was selling TEOS and the other chemicals and canisters that it manufactured in Texas to computer chip manufacturing companies located throughout the World, including Europe and South Korea.

In South Korea, in 1995, as a result of pressure from the South Korean Government and from computer chip manufacturing companies doing business in South Korea, ADCS and an unrelated Korean company jointly formed under Korean law ADCS-Korea Co., Ltd. (ADCS-Korea), for the purpose of manufacturing in South Korea TEOS and other chemical products that ADCS manufactured in the United States.

The shares of stock in ADCS-Korea were owned 70 percent by ADCS and 30 percent by South Korean interests.

In 1995, to the initial capitalization of ADCS-Korea, ADCS contributed $1.55 million and the South Korean company contributed $664,000.  These funds were used by ADCS-Korea to purchase machinery, equipment, vehicles, tools, and furniture, to hire employees and to purchase land in an industrial park in Anseong, South Korea, on which a chemical manufacturing plant was built.

In 1996, ADCS granted to ADCS-Korea a nonexclusive license to manufacture and to sell in South Korea TEOS and other chemicals over which ADCS had control, in return for which ADCS was to receive a royalty of 10 percent of gross sales.

The activities and operations of ADCS-Korea were conducted pursuant to a written joint venture agreement under which ADCS retained control of the management of ADCS-Korea. The executives of ADCS and, after July 9, 1996, the executives of petitioner, were active on a daily basis in supervising and managing the activities of ADCS-Korea. Senior executives of ADCS and of petitioner frequently traveled to South Korea to participate in the management of ADCS-Korea.

In July of 1995, ADCS moved its sales and executive offices from San Jose, California, to Austin, Texas, near its new manufacturing plant in Burnet, Texas.

During 1996, ADCS and petitioner considered and investigated establishing a chemical manufacturing plant in Belgium or in Scotland at an estimated cost of $3.5 million.

In January of 1996, ADCS adopted a plan of reorganization involving, among other things, a transfer of all of ADCS' operating assets to Advanced Delivery & Chemical Systems, Ltd. (ADCS-Limited), a Texas business limited partnership. The transfer to a Texas limited partnership of the operating assets of a corporation doing business in Texas constituted, during the

mid-1990s, a common form of business reorganization utilized by corporations to eliminate or to reduce substantially the 4.5-percent Texas corporate franchise tax on business income. See Tex. Tax Code Ann. sec. 171.001(a)(1), (b)(3) (West 2002) (imposing the Texas franchise tax on various business entities, but not on partnerships).

The six specific steps in ADCS' reorganization, all occurring between January 18 and January 22, 1996, are reflected below:

1. ADCS-Limited was formed as a Texas limited partnership;

2. Advanced Delivery & Chemical Systems Holdings LLC (Holdings LLC), was formed as a Delaware limited liability company to be taxed as a partnership. ADCS owned a 99-percent membership interest in Holdings LLC. The individual shareholders of ADCS owned the remaining 1-percent membership interest in Holdings LLC;

3. Advanced Delivery & Chemical Systems Operating, LLC (Operating LLC) was formed as a Delaware limited liability company to be taxed as a partnership. ADCS owned a 99-percent membership interest in Operating LLC;

4. Advanced Delivery & Chemical Systems Manager, Inc. (ADCS-Manager) was formed as a Delaware corporation owned 100 percent by the individual shareholders of ADCS. ADCS-Manager owned the remaining 1-percent membership interest in Operating LLC;

5. After the above entities were formed, 99 percent of the operating assets of ADCS were transferred to Holdings LLC, and the remaining 1 percent of the operating assets of ADCS were transferred to Operating LLC, except that (as stipulated by the

parties) certain patents, intangibles, and other stock interests in other business entities owned by ADCS were retained by ADCS;

6. Holdings LLC and Operating LLC then both contributed to ADCS-Limited the operating assets they had received from ADCS in exchange, respectively, for the receipt of a 99-percent limited partnership interest and a 1-percent general partnership interest in ADCS-Limited.

After the above six steps in the reorganization of ADCS were implemented, ADCS filed with respondent an election for subchapter S status, effective April 1, 1996.

In June of 1996, petitioner was formed as a Nevada corporation. Upon its formation, petitioner filed with respondent an election for subchapter S status, effective June 13, 1996. On July 9, 1996, ADCS was merged into petitioner.

In 1996, the initial shareholders in petitioner and their respective ownership interests in petitioner were as set forth below:

| Name | Percentage Interest |
|------|---------------------|
| Stephen H. Siegele | 68.4 |
| Frederick H. Siegele | 11.5 |
| Bernard McKeown | 11.5 |
| Stuart F. Siegele | 3.8 |
| Frederick J. Siegele | 3.3 |
| Robert Jackson | 1.6 |

Before ADCS' merger into petitioner, the shareholders in ADCS and their respective ownership interests in ADCS were identical to petitioner's initial shareholders as set forth

above.  Also, before the merger, Stephen Siegele was president of ADCS, and after the merger Stephen Siegele was president of petitioner.  Also, the other officers and directors of petitioner were essentially the same as the officers and directors of ADCS before the merger.[1]

As a result of ADCS' 1996 merger into petitioner, petitioner acquired ADCS' 99-percent membership interests in Holdings LLC and in Operating LLC, ADCS' 70-percent stock interest in ADCS-Korea, ADCS' licensor rights under the license agreement with ADCS-Korea, and the patents, intangibles, and stock interests that were retained by ADCS in the January reorganization.

ADCS-Limited was managed by the same individuals who had managed ADCS and who continued to manage petitioner.

The same business activities that had been conducted by ADCS before ADCS' merger into petitioner were conducted by petitioner after ADCS' merger into petitioner.

In 1997, ADCS-Limited purchased for $65,860 4.383 acres of land adjacent to its chemical manufacturing plant in Burnet, Texas, for the purpose of constructing thereon a 22,500-square-foot chemical manufacturing plant at a projected cost of $6 million.

---

[1]  Robert Jackson, a vice president of ADCS, became a shareholder in petitioner, but the record is unclear as to whether he became a vice president of petitioner.

In 1997 and in 1998, ADCS-Limited spent a total of approximately $3.4 million on equipment and improvements to its manufacturing plant in Burnet, Texas, including additional clean rooms, a new research and development lab, a quality control department, and a new computer system.

In July of 1997, ADCS-Limited began looking for additional office space to accommodate the growth of its sales and executive offices. Management estimated that it would cost ADCS-Limited $400,000 to relocate its administrative offices.

The chemical products manufactured by ADCS and by ADCS-Limited constituted hazardous materials, and the liability risks associated with such materials were significant for petitioner and for petitioner's affiliated companies. For example, in 1998 a former employee sued ADCS-Limited and ADCS for damages in excess of $35 million relating to exposure to hazardous materials. To avoid the high insurance premiums associated with such risks, during 1996 and 1997, petitioner retained funds in the range of $3 million to self-insure against such risks.

As indicated, ADCS had obtained a number of valuable patents relating to ADCS and to ADCS-Limited's chemical manufacturing processes. Petitioner anticipated that litigation would occur involving petitioner and its affiliated companies relating to the scope of the patents. Petitioner estimated the cost of filing a

patent lawsuit at $1 million and the cost of defending a patent lawsuit at $2 million.[2]

Over the years from its founding in 1988 until the October 1997 acquisition by ATMI, management of ADCS, of petitioner, of Holdings LLC and Operating LLC, and of ADCS-Limited generally maintained a policy of funding their activities and growth with internally generated funds, and they did not seek or obtain outside long-term financing to fund research and development of new products, corporate moves, new plant and office construction, or working capital. With the exception of the $72,000 bank loan obtained in 1990, all of the growth and expansion of ADCS, of petitioner, and of the affiliated companies was financed with funds raised within the affiliated companies.

During the calendar years of 1996 and 1997, Siegele was paid by ADCS-Limited a salary of approximately $2 million. Other senior management personnel of ADCS-Limited and of the affiliated companies also were paid, apparently by ADCS-Limited, annual salaries of approximately $300,000 each.

For each of the 1996 and 1997 calendar years, a consolidated income statement of ADCS, of petitioner, of the affiliated limited liability companies, and of ADCS-Limited reflected sales

---

[2] In 1999, ATMI paid approximately $2.7 million in connection with patent litigation relating to the business activities of petitioner and of its affiliated companies.

revenue, cost of sales, operating expenses, and net income after taxes as follows:[3]

|                        | 1996 | 1997 |
|------------------------|------|------|
| Sales Revenue          | $22,041,000 | $24,600,452 |
| Cost of Sales          | 6,567,000 | 8,352,577 |
| Operating Expenses     | 8,577,000 | 8,658,527 |
| Net Income After Taxes | 6,027,000 | 4,202,672 |

For 1996 and 1997, the respective yearend financial balance sheets of petitioner, of Holdings LLC, of Operating LLC, and of ADCS-Limited reflected cash assets as follows:

|              | 1996 | 1997 |
|--------------|------|------|
| Petitioner   | $ 16,549 | $ 7,876 |
| Holdings LLC | 12,582 | 11,623 |
| Operating LLC | 9,974 | 8,880 |
| ADCS-Limited | 3,545,495 | 5,212,451 |

Prior to the years in issue, ADCS had retained, and not distributed to its individual shareholders, a cumulative total of $9.7 million in earnings.

During petitioner's 1996 and 1997 short taxable years in issue, ADCS-Limited retained approximately $1.9 million and $2.9 million, respectively, in current earnings, and petitioner did not distribute any retained earnings to shareholders. Petitioner, however, did make distributions on behalf of its

---

[3] The figures for 1996 for sales revenue, cost of sales, operating expenses, and net income after taxes do not include figures for ADCS-Korea as such figures were not included in the record. The figures for 1997 reflect the figures for all of petitioner's affiliated companies and for ADCS-Korea.

shareholders in the form of payments to respondent with respect to the shareholders' 1996 Federal income tax liability relating to the reported income of petitioner for the months in 1996 for which petitioner qualified as an S corporation.

In the fall of 1996, ATMI began negotiations with the management of petitioner for the acquisition of petitioner and of its affiliated corporations, limited liability companies, and partnership. On January 10, 1997, a letter of intent was signed between petitioner and ATMI. On April 7, 1997, a formal written agreement and plan of merger was executed under which the proposed merger between petitioner and ATMI was to be accounted for as a "pooling of interests". Under the written merger agreement between petitioner and ATMI, and in accord with accounting standards applicable to pooling of interest transactions during the pendency of the transaction, petitioner was prohibited from making distributions to its shareholders other than for the shareholders' projected tax obligations relating to the income of petitioner. See also Accounting Principles Board Opinion 16, par. 47(c) (1970) (providing that for transactions accounted for as a pooling of interests, a corporation can only make distributions to its shareholders consistent with the corporation's historic dividend policy).

In April of 1997, management of petitioner still considered petitioner to be qualified as an S corporation.

As indicated, on October 10, 1997, ATMI's acquisition of petitioner and indirectly of petitioner's affiliated corporations, limited liability companies, and partnership was consummated.

On or about April 15, 1997, there was filed on behalf of petitioner a subchapter S Federal corporate income tax return for petitioner's stated short taxable year commencing April 1, 1996, and ending December 31, 1996.  At the time this subchapter S corporate tax return was filed, management of petitioner and petitioner's tax return preparer were unaware that on October 7, 1996, petitioner's subchapter S status inadvertently had been terminated when one of petitioner's individual shareholders, apparently without knowing the transfer would terminate petitioner's subchapter S status, transferred to a partnership, an ineligible subchapter S corporate shareholder, his minority stock interest in petitioner.

Thereafter, on approximately June 30, 1997, when termination of petitioner's subchapter S status had come to the attention of petitioner's management, there was filed on behalf of petitioner an amended subchapter S Federal corporate income tax return for petitioner's corrected short taxable year commencing April 1, 1996, and ending October 7, 1996, to reflect the

October 7, 1996, termination of petitioner's subchapter S status.[4]

On or about June 30, 1997, there was filed on behalf of petitioner a subchapter C Federal corporate income tax return for petitioner's 1996 short taxable year beginning October 8, 1996, and ending December 31, 1996.  On this subchapter C corporate tax return, petitioner reported the approximate $1.9 million in current year retained earnings, and petitioner reflected the approximate $9.7 million in retained earnings accumulated in prior years, essentially all of which earnings were merely allocated to petitioner from and through ADCS-Limited, Holdings LLC, and Operating LLC (because ADCS-Limited, Holdings LLC, and Operating LLC were treated as nontaxable partnerships). Essentially all the funds reported as retained earnings by petitioner actually were held and retained by ADCS-Limited, and were never actually distributed to petitioner.

On or about June 15, 1998, there was filed on behalf of petitioner a subchapter C, Federal corporate income tax return for petitioner's 1997 short taxable year beginning January 1, 1997, and ending October 10, 1997.  On this subchapter C

---

[4]  Even though petitioner was not incorporated until June 13, 1996, petitioner's original and amended subchapter S corporate Federal income tax returns for its first short taxable period apparently were filed for the short taxable period beginning as of Apr. 1, 1996.

corporate tax return, petitioner reported the approximate $2.9 million in current year retained earnings, and petitioner reflected the approximate $11.6 million in retained earnings accumulated in prior years. Similar to the situation in the prior taxable year, essentially all of the earnings reported as retained earnings in petitioner's October 10, 1997, short taxable year were merely allocated to petitioner from and through ADCS-Limited, Holdings LLC, and Operating LLC. None of the retained earnings were actually distributed to petitioner.

On audit, respondent determined that during petitioner's short taxable years ending December 31, 1996, and October 10, 1997, petitioner constituted a mere holding company, that petitioner did not establish reasonable business needs for retaining the approximate $1.9 million and $2.9 million in current year earnings allocated to petitioner from and through ADCS-Limited, Holdings LLC, and Operating LLC, and that petitioner, therefore, was subject to the accumulated earnings tax for each of the short taxable years in issue.

On July 31, 2000, respondent issued to petitioner a notice of deficiency with respect to petitioner's short taxable years ending December 31, 1996, and October 10, 1997, wherein respondent, relying on the provisions of section 535, calculated petitioner's accumulated taxable income and accumulated earnings tax thereon as follows:

| Short Taxable Year Ending | Accumulated Taxable Income | Accumulated Earnings Tax |
|---|---|---|
| Dec. 31, 1996 | $1,247,731 | $ 494,101 |
| Oct. 10, 1997 | 3,985,131 | 1,578,112 |

OPINION

Generally, under section 532(a), a corporation that permits earnings and profits to accumulate for the purpose of avoiding the Federal income tax that would be imposed on its shareholders with respect to distributions of earnings and profits made to the shareholders is subject to the accumulated earnings tax of sections 531 through 537. S corporations, however, are not subject to the accumulated earnings tax. See sec. 1363(a).

Whether a corporation accumulated earnings for the prohibited purpose of avoiding the Federal income tax with respect to its shareholders involves a question of fact. E.g., Snow Manufacturing Co. v. Commissioner, 86 T.C. 260, 269 (1986) (citing Bremerton Sun Publg. Co. v. Commissioner, 44 T.C. 566, 582 (1965)). A conclusion as to whether a corporation was formed or availed of for the prohibited purpose of avoiding Federal income tax is made with respect to the state of mind of those individuals who were in control of the corporation. Helvering v. Natl. Grocery Co., 304 U.S. 282, 292-294 (1938).

A conclusion that a corporation is to be treated as a "mere holding company" or that the management of the corporation has permitted its earnings and profits to accumulate beyond the

"reasonable needs" of the corporation's business generally is determinative as to whether the corporation accumulated earnings for the prohibited purpose of avoiding the Federal income tax with respect to its shareholders.  Sec. 533(a) and (b).

A corporation held to be a mere holding company or to have accumulated earnings and profits in excess of the reasonable needs of its business nevertheless may avoid imposition of the accumulated earnings tax if it is established that the corporation was not formed or availed of for the prohibited purpose of avoiding the Federal income tax with respect to its shareholders.  Sec. 1.533-1(a)(2), Income Tax Regs.

Mere Holding Company

For purposes of the accumulated earnings tax, whether a corporation's activities constitute sufficient activities to avoid classification as a mere holding company turns upon the facts and circumstances of each case.  Dahlem Found., Inc. v. Commissioner, 54 T.C. 1566, 1574 (1970) (citing Beim Co. v. Landy, 113 F.2d 897, 900 (8th Cir. 1940)).  The burden of proof as to whether a corporation constitutes a mere holding company is placed on the corporation and may not be shifted under section 534.  See Rule 142(a); H.C. Cockrell Warehouse Corp. v. Commissioner, 71 T.C. 1036, 1045-1046 (1979).[5]

---

[5]  It appears that with certain limitations a shift in the
(continued...)

In <u>Dahlem Found., Inc. v. Commissioner</u>, <u>supra</u>, we concluded that a corporation's activities (e.g., locating land for a shopping center, negotiating and paying the purchase price for the land, securing leases for occupancy of buildings in the new shopping center, and performing management functions with respect to the shopping center) established that the corporation did not constitute a mere holding company for purposes of the accumulated earnings tax. <u>Id.</u> at 1576-1577. We explained that the word "mere" in the statutory language at issue is meant to draw a distinction between corporations that are strictly passive in nature and those which engage in some measure of business activity. <u>Id.</u> at 1576; see also sec. 1.533-1(c), Income Tax Regs. (defining a holding company as a corporation that has practically no activities except holding property and collecting income therefrom).

Under section 1.537-3(b), Income Tax Regs., it is provided that, for purposes of the accumulated earnings tax, where a corporation substantially owns and effectively operates a subsidiary company, the business activities of the subsidiary may

---

[5](...continued)
burden of proof as to whether a corporation constitutes a mere holding company for purposes of the accumulated earnings tax may be available under the provisions of sec. 7491. The parties herein, however, do not request any such shift in the burden of proof as to the issue of petitioner's status as a mere holding company.

be attributed to the parent corporation.  The relevant language of section 1.537-3(b), Income Tax Regs., provides as follows:

> If one corporation owns the stock of another corporation and, in effect, operates the other corporation, the business of the latter corporation may be considered in substance, although not in legal form, the business of the first corporation.  * * * Thus, the business of one corporation may be regarded as including the business of another corporation if such other corporation is a mere instrumentality of the first corporation; that may be established by showing that the first corporation owns at least 80 percent of the voting stock of the second corporation.  If the taxpayer's ownership of stock is less than 80 percent in the other corporation, the determination of whether the funds are employed in a business operated by the taxpayer will depend upon the particular circumstances of the case. * * *

See also Inland Terminals, Inc. v. United States, 477 F.2d 836, 839-841 (4th Cir. 1973) (holding that the above regulation generally allows a subsidiary corporation to accumulate earnings for the business needs of its parent corporation); Montgomery Co. v. Commissioner, 54 T.C. 986, 1006-1007 (1970) (applying the above regulation and concluding that a corporation did not constitute a mere holding company where the taxpayer pursued a business venture through its wholly owned subsidiary); Farmers & Merchs. Inv. Co. v. Commissioner, T.C. Memo. 1970-161 (applying the above regulation and concluding that, although a corporation owned less than 80 percent of the voting stock of its subsidiary, the subsidiary's business was attributable to the corporation

because the facts and circumstances indicated that at all times the corporation had effective control over the subsidiary).

Petitioner contends that the activities of ADCS-Limited and of ADCS-Korea should be attributed to it and that it therefore should not be treated as a mere holding company.

Respondent argues that petitioner did not engage in business activities of its own, that petitioner merely collected income from its affiliated entities whose activities should not be attributed to petitioner, and that petitioner should be regarded as a mere holding company.

Respondent argues further that section 1.537-3(b), Income Tax Regs., should not be applied to attribute to petitioner the business activities of ADCS-Limited because petitioner's ownership interest in ADCS-Limited was tiered rather than direct, and because section 1.537-3(b), Income Tax Regs., according to respondent, applies only to controlled corporate subsidiaries and not to controlled partnerships. As a reason for not allowing the activities of ADCS-Limited and of ADCS-Korea to be attributed to petitioner, respondent cites to Commissioner v. Natl. Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149 (1974), and to the general rule that taxpayers are held to the form of their transactions.

Petitioner counters with the argument that the clear intent and effect of section 1.537-3(b), Income Tax Regs., is that

corporate taxpayers, in appropriate circumstances, are allowed to take into account business activities of and to accumulate earnings for the needs of business entities they control, even though the taxpayer constitutes a separate legal entity. Petitioner also argues that through general partnership principles the business needs of a partnership may be attributed to a corporate partner that controls the partnership.

We agree generally with petitioner. For accumulated earnings tax purposes, respondent's own regulations allow corporations, depending on the facts and circumstances to treat the business activities of affiliated entities as their own. See sec. 1.537-3(b), Income Tax Regs.

Respondent cites to Turner v. Commissioner, T.C. Memo. 1965-101, wherein it was found that a corporate taxpayer, for purposes of the accumulated earnings tax, had unreasonably accumulated earnings and profits for the needs of a partnership in which the corporation owned a limited partnership interest. The basis for the holding in this Memorandum Opinion appears to be that, as a limited partner, the corporation had limited risk and liability and therefore could not be called upon to pay any of the debts of the partnership and therefore could not be forced to invest additional funds in the limited partnership. In this regard, we believe respondent reads too much into Turner. For accumulated earnings tax purposes, in addition to what a corporation is

required or legally obligated to do, it is also relevant what management of a corporation reasonably believes constitutes the reasonable needs of the business.  See, e.g., <u>Ivan Allen Co. v. United States</u>, 422 U.S. 617, 624-628 (1975).

We also note that in <u>Turner v. Commissioner</u>, <u>supra</u>, the activities of a partnership in which the taxpayer held a general partnership interest were taken into account in concluding that the taxpayer did not constitute a mere holding company.  We believe that this aspect of the holding in <u>Turner</u> supports our holding herein that activities of an affiliated partnership may support the accumulation of earnings by a corporation that owns a controlling interest in the partnership.  We note that, through Holdings LLC and Operating LLC, petitioner owned 99 percent of the limited <u>and</u> 99 percent of the general partnership interests in ADCS-Limited.

Under the particular facts and circumstances of this case, in evaluating the earnings retained by petitioner as of the end of its short 3-month taxable year ending December 31, 1996, and as of the end of its short 9-month taxable year ending October 10, 1997, we believe it appropriate to take into account the business activities of ADCS-Limited and of ADCS-Korea.  The facts before us establish that petitioner and its affiliated corporations, limited liability companies, and partnership

maintained a close-knit structure, management, and operation despite the different levels and forms of the affiliate entities.

In certain respects, as a partnership controlled by petitioner, the activities of ADCS-Limited had a closer business relationship to petitioner than they would have had if ADCS-Limited had been a corporate subsidiary of petitioner. As explained, as a partnership, ADCS-Limited was not treated as a taxable entity. Income taxes relating to the activities of ADCS-Limited were the responsibility of its partners, and because its partners (namely, Holdings LLC and Operating LLC) also were taxed as partnerships (i.e., also as passthrough entities), the liability for the taxes relating to the earnings and income of ADCS-Limited was passed on to petitioner, including exposure to an adjustment for the accumulated earnings tax, even though ADCS-Limited, not petitioner, actually retained the earnings in question. A conclusion that the business activities of ADCS-Limited should not be attributable to petitioner, for purposes of the accumulated earnings tax, would be inconsistent with the fact that the retained earnings in question actually were held by ADCS-Limited but the Federal income taxes relating to those earnings were the obligation of, and were to be paid by, petitioner.

Petitioner also effectively controlled and operated ADCS-Korea. Further, petitioner held certain patents and intangibles relating to the business activities of its controlled entities.

On the facts of this case and for accumulated earnings tax purposes, we conclude that petitioner is not to be regarded as a mere holding company for purposes of the accumulated earnings tax.

Reasonableness of Retained Earnings

In general, a corporation is allowed to retain earnings to provide for the reasonable needs of its business without imposition of the accumulated earnings tax. Secs. 533(a), 535(c), 537(a)(1).

Generally, for the following purposes, among others, a corporation may retain earnings without incurring an accumulated earnings tax liability: (1) To provide for bona fide business expansion and plant replacement, sec. 1.537-2(b)(1), Income Tax Regs.; (2) to provide necessary working capital for the business, sec. 1.537-2(b)(4), Income Tax Regs.; (3) to provide for contingent business liabilities such as product liability losses, sec. 537(b)(4); sec. 1.537-2(b)(6), Income Tax Regs.; and (4) to provide for anticipated litigation involving intellectual property. See Steelmasters, Inc. v. Commissioner, T.C. Memo. 1976-324; Fotocrafters, Inc. v. Commissioner, T.C. Memo. 1960-254.

Whether a corporation has permitted its earnings and profits to accumulate beyond the reasonable needs of its business constitutes a question of fact, and we generally defer to the determinations of the reasonable business needs that were made by corporate officers and directors, unless the facts and circumstances require us to substitute our business judgment for theirs.[6] Snow Manufacturing Co. v. Commissioner, 86 T.C. 260, 269 (1986) (citing Atl. Prop., Inc. v. Commissioner, 62 T.C. 644, 656 (1974), affd. 519 F.2d 1233 (1st Cir. 1975); Faber Cement Block Co. v. Commissioner, 50 T.C. 317, 329 (1968)).

In order to classify retained earnings as accumulations for reasonable business needs, a corporation is required to have specific, definite, and feasible plans for using the retained earnings. Sec. 1.537-1(b)(1), Income Tax Regs. The plans for use of retained earnings that will be treated as reasonable are those that project use of the earnings within a reasonable time period viewed in light of all of the facts and circumstances. Id. It is not necessary that plans for the use of retained earnings be set forth in formal minutes, but evidence of a definitive plan coupled with action taken toward the realization thereof are expected. See Doug-Long, Inc. v. Commissioner, 72

---

[6] Under the procedures outlined in sec. 534, the burden of proof regarding whether petitioner accumulated earnings and profits beyond the reasonable needs of its business has been placed on respondent.

T.C. 158, 171 (1979).  The test is whether the alleged plan appears to have been "'a real consideration during the taxable year, and not simply an afterthought to justify challenged accumulations.'"  Faber Cement Block Co. v. Commissioner, supra at 332-333 (quoting Smoot Sand & Gravel Corp. v. Commissioner, 274 F.2d 495, 499 (4th Cir. 1960), affg. T.C. Memo. 1958-221).

On this question, respondent's arguments are well presented and well briefed. Respondent argues primarily that petitioner lacked definite and specific plans for the use of the $1.9 million and the $2.9 million in earnings that were retained as of the end of the 1996 3-month and the 1997 9-month short taxable years in issue.  Further, respondent contends that had the above retained earnings been distributed to petitioner from and through ADCS-Limited, Holdings LLC, and Operating LLC, and then distributed by petitioner as dividends to its shareholders, ADCS-Limited's $9.7 million in retained earnings from prior years would have remained available for use in ADCS-Limited's business and would have been sufficient to meet petitioner's and its affiliate's reasonable business needs.

Based on our analysis of the evidence and on our understanding of the facts before us, however, we conclude that ADCS-Limited's and petitioner's retention of the earnings in question in the short taxable years before us was reasonable. Petitioner's management developed not exhaustive but

sufficiently specific plans that are reflected in minutes of ADCS' and of petitioner's board meetings, in cost and design estimates, and in other documentation.  Some of the reasonably anticipated business needs and the amount of the projected expenditures relating thereto are set forth below:

| | |
|---|---|
| European Manufacturing Plant | $ 3,500,000 |
| Burnet, Texas, New Manufacturing Plant | 6,000,000 |
| Relocation of Administrative Offices | 400,000 |
| Product Liabilities | 3,000,000 |
| Patent Litigation | 3,000,000 |
| Total | $15,900,000 |

The decision of the management of petitioner and of ADCS-Limited to retain its current earnings during the 1996 3-month short taxable year and during the 1997 9-month short taxable year, rather than have ADCS-Limited distribute the earnings through Holdings LLC and Operating LLC to petitioner and have petitioner pay out the earnings as dividends to its individual shareholders, reflected the reasonable business plans developed by management of petitioner and of its affiliated entities to use the earnings to finance the continued rapid growth of petitioner and the expanding business activities of petitioner's affiliates.[7]  For the years in issue, the plans established by

---

[7]  With the exception of petitioner's plan to locate a manufacturing plant in Europe, the planned expenses of petitioner set forth above were carried out or realized either by petitioner or by ATMI within a short period of time following ATMI's acquisition of petitioner.  The planned 22,500-square-foot

(continued...)

the management of petitioner and of petitioner's affiliated corporations, limited liability companies, and partnership for using the retained earnings were especially reasonable in light of the short time in which petitioner had operated as a corporation, having just been organized in June of 1996.

In light of the relatively rapid growth of ADCS from the time of its formation in 1988 until its merger into petitioner in 1996, and in light of petitioner's plans to continue growing and expanding the business operations and activities after petitioner's merger with ADCS, we conclude that the $1.9 million and the $2.9 million in earnings retained by ADCS-Limited and reported by petitioner during the short taxable years in issue did not exceed petitioner's reasonable business needs and did not exceed a reasonable accumulation of earnings.[8]

Respondent argues that the reorganization of petitioner's corporate structure to produce favorable Texas franchise tax consequences represents strong evidence of the tax sensitivity

---

[7](...continued)
manufacturing plant was never constructed by ADCS or by petitioner, but, at the time of trial in 2002, a new 70,000-square-foot chemical manufacturing plant was being constructed by ATMI on 200 acres of land in Burnet, Texas, at an estimated cost of $20 million.

[8] In accord with Bardahl Manufacturing Corp. v. Commissioner, T.C. Memo. 1965-200, on brief petitioner sets forth calculations for its working capital needs for the 1996 and 1997 calendar years, but the record was incomplete for purposes of verifying petitioner's calculations. Respondent provided no Bardahl working capital calculations for petitioner.

and tax motivation of petitioner's management and indicates that petitioner's management intended to avoid the shareholder level Federal income tax with respect to petitioner's corporate earnings.

We do not regard the State tax planning of petitioner's management on behalf of petitioner and its affiliated companies as establishing an intent on the part of petitioner's management to avoid the shareholder level tax on petitioner's retained earnings.  To the contrary, and as we have explained, petitioner operated during the second half of 1996 and during the first half of 1997 (during most of the short taxable years in issue) with the understanding of petitioner's management that petitioner qualified as an S corporation, under which only a single level tax would be imposed.  By the time petitioner's management discovered in mid-1997 that petitioner's subchapter S status had been inadvertently terminated, petitioner's management was restricted under the pending merger agreement with ATMI and under generally accepted accounting principles from making any significant dividend distributions to its shareholders.  This then extant and legitimate misunderstanding of petitioner's management with regard to petitioner's subchapter S status and the single level tax applicable thereto runs counter to respondent's argument that avoidance of the shareholder level tax

with respect to petitioner's retained earnings constituted the reason such earnings were retained and not distributed.

On the credible evidence before us, even if petitioner were regarded as a mere holding company for purposes of the accumulated earnings tax, and even if petitioner were regarded as having accumulated earnings beyond the reasonable needs of its business, the evidence establishes that petitioner did not accumulate its earnings during its 1996 and 1997 short taxable years before us for the purpose of avoiding the Federal income tax with respect to its shareholders.

We conclude that for the short taxable years in issue petitioner did not permit its earnings and profits to accumulate for the purpose of avoiding the Federal income tax with respect to its shareholders. Petitioner is not subject to the accumulated earnings tax for the years in issue.

<u>Decision will be entered</u>

<u>for petitioner</u>.